*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0042P (6th Cir.)
File Name: 03a0042p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

MAURICE A. MASON,
    *Petitioner-Appellant,*

    *v.*

No. 00-3765

BETTY MITCHELL,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 99-00524—David A. Katz, District Judge.

Argued: October 24, 2001

Decided and Filed: February 6, 2003

Before: BOGGS, MOORE, and CLAY, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** David C. Stebbins, Columbus, Ohio, for Appellant. Matthew C. Hellman, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** David C. Stebbins, Columbus, Ohio, Carol Wright, Columbus, Ohio, for Appellant. Matthew C. Hellman, Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

1

MOORE, J., delivered the opinion of the court, in which CLAY, J., joined. BOGGS, J. (pp. 56-63), delivered a separate dissenting opinion.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellant Maurice Allen Mason ("Mason") was convicted by an Ohio jury of aggravated felony murder, rape, and having a weapon while under disability; he was also found guilty of the death-penalty specification of committing murder in the course of a rape and further specifications that involved firearms, prior felony, and prior offense of violence. Mason was sentenced to death. Mason now appeals the district court's denial of his petition for a writ of habeas corpus and his request for an evidentiary hearing. We have carefully considered all of the eight claims that Mason raises and **AFFIRM** the district court's decision to deny habeas corpus relief, but with one important exception. Mason contends that he was denied the effective assistance of counsel at the sentencing phase. Because the record as it now stands is insufficient for us to determine whether this claim has merit, we **REMAND** this case to the district court for an evidentiary hearing on this one issue.

### I. BACKGROUND

On February 8, 1993, Robin Dennis ("Robin"), the nineteen-year-old wife of Chris Dennis ("Chris"), disappeared. Earlier that day, Robin and Chris had socialized with Mason and other friends, and Chris and Mason had discussed trading Chris's .22 caliber Colt Frontier Scout revolver for Mason's television. The next day, Robin was reported as missing to the Union County Sheriff's Department; the report stated that Mason was the last person seen with Robin.

least, to be the most efficacious in achieving defendant's goal of continued life.

The fact that a trial strategy did not work does not make the *ex ante* decision to employ it, under circumstances where hardly any trial strategies would seem attractive, constitutionally defective lawyering. Given the Supreme Court's admonishments against using the penalty phase and the Sixth Amendment as a lever in death penalty cases, and the sound strategic reasons for the omission of Mason's background by his counsel, I respectfully dissent.

Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") explicitly limits the circumstances under which an evidentiary hearing may be granted in habeas proceedings. *See* 28 U.S.C. § 2254(e)(2). If Mason failed to develop a sufficient "factual basis of a claim in State court proceedings," this court must dismiss the claim and cannot order an evidentiary hearing *unless* the claim relies on a "new rule of constitutional law made retroactively applicable to cases on collateral review by the Supreme Court, that was previously unavailable; *or* a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2). Neither of these conditions obtain in this case. This court makes clear that Mason raised these arguments in Ohio state courts. Mason also had an opportunity to introduce extensive evidence, of which he somewhat availed himself, regarding what defense counsel could have done. Any factual deficiency in Mason's claim that prevents us from accepting it may not be cured by a federal court in habeas proceedings when there is no evidence in the record that Ohio courts prevented Mason from making a sufficient factual record. This court's current remedy of ordering an evidentiary hearing is invalid under Section 2254(e)(2) of AEDPA.

Ironically, if counsel's true aim is to see that his client's life is spared, the most effective tactic under cases such as the one today is to omit some step so that our court will later find counsel was *not* "effective." Creative habeas counsel can conjure up myriad possible scenarios in which a claim can *now* be made that some information would surely have convinced a jury to spare the life of a heinous murderer, without having to face the actual consequence that such information could easily have been ineffective, or worse. In fact, if trial counsel were to use the "kitchen sink" approach seemingly advanced by respondent's counsel, and introduce every scrap of information now claimed to be helpful (including his becoming "certified in Heating and Air Conditioning," *see* Mason's Br. at 72 n.28), one could probably find *that* approach "ineffective" for depriving the defendant of the argument that has proven, in this circuit at

On February 10, 1993, Deputy Sheriff Jack Lautenslager ("Lautenslager") received a report about an abandoned car in a rural area of Marion County. Two days earlier, Lautenslager had driven through that area and seen a black man walking, whom he later identified as Mason.[1] Chevron-style shoe impressions, similar to those made by shoes that Mason and Robin owned, were found on the outside of the passenger door and on the passenger's side of the dash. Type-B blood, Robin's blood type, was found on the inside of the passenger door.[2] A set of keys, including car keys that fit a 1981 Chrysler owned by Mason's wife, was on the car's front passenger seat.

A few hours after this discovery, Dennis Potts ("Potts") of the Marion County Sheriff's Department questioned Mason about Robin's disappearance. This interview took place at the detective's office of the Sheriff's Department and lasted for eighteen minutes. On February 12, 1993, following up on information from other interviews, Potts questioned Mason again. The second interview took place in a basement interrogation room and lasted, with pauses in the questioning, for four hours. Mason appears to have understood that he was not under arrest at this time. After the second interview, Mason's parole officer took him into custody for a parole violation.

On February 13, 1993, Robin's body was found inside an abandoned building that was within eighteen minutes' walking distance from where her car had been found. She was lying face down, wearing only a bra; her jeans and underwear were pulled down to her ankles. Robin's T-shirt and car keys were under her jacket, which was found eight feet from her body with burrs and debris on it. The apparent murder weapon, a blood-stained board with protruding nails,

---

[1] Another witness testified to seeing a person who fit Mason's description walking in the general area at that time.

[2] Type-B blood was later found on the side of a tennis shoe that Mason was wearing on February 12, 1993.

was found twenty feet from her body. Another piece of wood found at the scene had strands of hair that matched Robin's hair. On February 15, 1993, detectives found a small blood-stained piece of metal at the crime scene, which a firearms examiner later concluded was identical to a grip-frame from a .22 caliber Colt Frontier Scout revolver and was consistent with having come from the handle of such a revolver.

On February 14, 1993, pathologist Dr. Keith Norton ("Norton") conducted an autopsy and concluded that Robin had died as a result of blunt force trauma causing multiple skull fractures. Dr. Norton determined that the blood-stained board found at the scene and the butt of a revolver could have caused Robin's injuries. Dr. Norton also found sperm in Robin's vagina that DNA experts later matched to Mason's DNA. DNA material from Robin's underwear also matched Mason's DNA. The experts did not find DNA from anyone other than Robin and Mason.

On September 30, 1993, Mason was charged with (1) aggravated murder, with a death penalty specification that the murder occurred during the commission of a rape; (2) rape, with a prior aggravated felony specification; and (3) having a weapon while under disability, with an offense of violence specification.[3] Mason pleaded not guilty. In October 1993, the trial court found Mason to be indigent and appointed Lawrence A. Winkfield ("Winkfield") of Columbus, Ohio, as lead counsel and Ted I. Coulter of Marion, Ohio, as co-counsel.

Mason's attorneys filed numerous pretrial motions, including a request for expert assistance and a motion to suppress, both of which the trial court denied after hearing oral argument. The week before trial, defense counsel moved for a continuance, claiming that they needed more time to review the 411 pages of documents that the prosecutor had delivered to them on May 20, 1994. The trial court refused to

---

[3] On December 21, 1993, Mason was reindicted on the same charges, but with a firearm specification added to each of the three counts.

more than an assertion: "Testimony that simply put Mason's childhood into context without misinterpreting it would not have been the subject to the prosecutor's rebuttal evidence, which mostly concerned Mason's character." Slip op. at 29. The court's cursory opinion of Ohio evidence law narrowly construes the trial court's explicit ruling on this matter. See Tr. at 4211. The trial court indicated that extremely damaging evidence could have been introduced "had the Defense elected to proceed with a more expansive mitigation strategy." JA at 1761. Mason concedes that "[t]he trial court ruled that such evidence," referring to evidence of Mason's past criminal behavior, "would be admissible." Mason's Br. at 13. Defense counsel undoubtedly could have presented the evidence notwithstanding the trial court's determination, inviting the introduction of Mason's prior criminal record by the prosecution, and appealed a district court decision to admit Mason's negative history as rebuttal evidence. Yet we have never held that defense counsel is constitutionally obligated to take such a risk, especially when the trial court's ruling is far from clearly the abuse of discretion that would be required to overturn its evidentiary determination.

Indeed, the trial court's ruling makes ample sense. By raising the factual question of his background and prior activities, the defendant makes his entire background relevant. After all, the mitigation case with this evidence would have been that Mason was a victim of his parents' violence and drug activities and that this sorrowful childhood led an otherwise innocent boy into personal drug use and ultimately to commit a horribly violent crime. The evidence of his criminal record would have been directly relevant to rebut this story, showing a young man, far from innocent, who has engaged in a consistent campaign of violent crime, including a rape eerily similar to that for which he had just been convicted.

Finally, given the infirmity of this court's determination regarding defense counsel's potential ineffectiveness, there is even less legal foundation for its decision to remand this case for an *evidentiary hearing* on his ineffectiveness claim. The

I believe that counsel's decision not to present evidence of Mason's childhood was reasonable or that, at the very least, the Ohio Supreme Court's denial of Mason's claim was not an unreasonable application of *Strickland v. Washington*, 466 U.S. 866 (1984), as it must be for this court to overturn its decision. *See* 28 U.S.C. § 2254(d)(1). The court assumes that any defense counsel who would not have presented the details of Mason's past to the jury would have been either indifferent to his client's fate or incompetent. As the court states: "Had trial counsel conducted an adequate investigation, the jury *would have* heard substantial evidence about how drug use and violence pervaded Mason's background and life history." Slip op. at 21.

To me, the record is clear that defense counsel not only was aware of Mason's background, but also made a reasonable strategic decision not to present evidence of Mason's background to the jury. Defense counsel's decision addresses the fundamental dilemma for penalty-phase presentations. To some, recounting a childhood filled with drug use and crime would arouse sympathy and provide an explanation for otherwise heinously violent crimes, but to others it would tell a story of waste, lifelong moral turpitude, and incorrigibility. The omitted evidence here is far less mitigating than the relevant evidence in *Bell v. Cone*, that the defendant had been traumatized during honorable military service to his country, the omission of which the Supreme Court determined not to be unconstitutionally ineffective assistance. The evidence omitted here is potentially aggravating in the minds of some jurors, and its probable effect is a judgment call for counsel in the context of his understanding of the jury's composition. Defense counsel's choice to omit Mason's background, and it was a choice, is a quintessential strategic decision that cannot form the basis of a *Strickland* challenge.

This court also flatly suggests that this particular evidence, of Mason's troubled childhood and early drug use, would not have permitted the prosecution to introduce rebuttal evidence regarding Mason's extensive, violent, and contemporaneous history of criminal activity. The court's claim here is nothing

grant a continuance and threatened to remove defense counsel without paying any fees. On May 31, 1994, Mason proceeded to a three-week-long jury trial; he was found guilty on all three counts.

On June 27, 1994, the trial entered the sentencing phase. Mason's mitigation case consisted of the testimony of seven witnesses and Mason's unsworn statement. On June 29, 1994, the jury recommended that Mason be sentenced to death, which recommendation the trial court adopted. On August 9, 1994, the trial court heard oral argument on and then denied Mason's motion for a new trial.

Mason then filed a timely appeal to the Court of Appeals for the Third Appellate District, asserting twenty-four assignments of error. On December 9, 1996, the Court of Appeals affirmed the trial court's judgment. *State v. Mason*, 1996 WL 715480, at *33 (Ohio Ct. App. Dec. 9, 1996). Mason thereafter filed a notice of appeal and a brief in the Ohio Supreme Court. On June 17, 1998, the Ohio Supreme Court affirmed Mason's conviction and death sentence on direct appeal. *State v. Mason*, 694 N.E.2d 932, 958 (Ohio 1998).

While his direct appeal was pending, Mason filed a state collateral attack in the Court of Common Pleas of Marion County, asserting seven assignments of error. *State v. Mason*, 1997 WL 317431, at *1 (Ohio Ct. App. June 6, 1997). On November 21, 1996, the court denied relief without holding an evidentiary hearing. *Id.* Mason appealed the dismissal of his post-conviction petition to the Court of Appeals for the Third Appellate District, which affirmed the judgment of the Court of Common Pleas on June 6, 1997. *Id.* at *7. Mason then filed a timely appeal to the Ohio Supreme Court, which dismissed the appeal on October 15, 1997, as not involving any substantial constitutional question.

On July 15, 1999, Mason filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, raising twenty-five challenges to his conviction and sentence. On May 9, 2000, the district court denied Mason's habeas petition and

his motion for an evidentiary hearing on various claims. *Mason v. Mitchell*, 95 F. Supp. 2d 744, 795 (N.D. Ohio 2000). The district court subsequently granted a certificate of appealability as to all claims. This timely appeal followed.

## II. ANALYSIS

We review de novo the legal conclusions of a district court in a habeas proceeding. *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). Because Mason filed his habeas petition on July 15, 1999, after the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") became effective, this case is governed by AEDPA. *Id.* Under AEDPA's provisions, we may not grant a writ of habeas corpus for any claim that was adjudicated on the merits in state court unless the adjudication:

(1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). In addition, the findings of fact made by a state court are presumed to be correct and can be contravened only if the habeas petitioner can show by clear and convincing evidence that the state court's factual findings were erroneous. *Id.* § 2254(e)(1). This presumption of correctness also applies to the factual findings made by a state appellate court based on the state trial record. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981).

AEDPA provides the following standard for determining whether a petitioner is entitled to an evidentiary hearing:

(e)(2)  If the applicant has failed to develop the factual basis of a claim in State court proceedings, the

Videotape Deposition of Dr. Robert T. Spare at 5:57 P.M. According to Spare, Mason began extensive involvement in his parents' drug business in "the middle elementary grades" and started using drugs regularly "about the same time." *Id.* at 5:58 P.M. Spare also testified that Mason said that he had been regularly beaten by his father. *Ibid.*

Spare further testified as to several "exhibits offered for mitigation purposes" that he had reviewed in the course of his treatment of Mason. These exhibits were in the record of the deposition and included several reports from social services agencies that included extensive records of domestic and child abuse in Mason's home and the drug-seeking activities of Mason's parents. The defendant was present during the deposition, *id*. at 5:51 P.M., and thus would have been able to advise his attorney of any additional material that might have been relevant. In any event, the deposition shows that Dr. Spare was aware of, and fully related to counsel, the gist of the material on Mason's background as to which the court now appears to be uncertain.

In short, Spare's deposition explicitly covers all of the information to which defense counsel was allegedly not exposed due to shoddy investigation into mitigating evidence. Accordingly, this case seems indistinguishable from prior cases in which we have denied claims of ineffective assistance based on alleged failure to investigate mitigating evidence. Specifically, the defendant has identified no evidence of which defense counsel was not already aware at the time of the penalty phase proceedings. *See Buell v. Mitchell*, 274 F.3d 337, 361 (6th Cir. 2001).

The relevant question is the one that this court declines today to answer, whether defense counsel's decision not to present certain evidence of the drug-related activities of Mason's parents, of Mason's long history of drug use, and of the physical abuse to which Mason was subjected, was a reasonable strategic choice of counsel or was within the wide range of decisions that constitute constitutionally effective representation.

adequacy of Mason's representation. Instead, the court contends that defense counsel did not sufficiently investigate Mason's "history, character, or background." According to the court, any investigation would have revealed Mason's traumatic childhood, his living with parents who were drug dealers and users, the regular beatings that he received from his father, and the resulting drug addiction that Mason himself developed from the age of eleven. The court suggests that counsel's failure to present this tale of woe to the jury was not the result of a strategic choice in the heat of litigation, but a lack of knowledge regarding Mason's background. The court argues that, "[h]ad trial counsel conducted an adequate investigation, the jury *would have* heard substantial evidence about how drug use and violence pervaded Mason's background and life history." Slip op. at 21. (emphasis added). Indeed, the court notes Mason's post-conviction testimony that he did not recall defense counsel ever interviewing him regarding his background, much less that of any of his family members. Slip op. at 20-21.

The existing record in this case contradicts the court's finding that defense counsel had no knowledge of these particularly tragic features of Mason's background. As the court indicated, defense counsel was provided with the services of Dr. Robert T. Spare, a psychologist who examined the defendant to determine, among other things, his future dangerousness. Spare also took an relatively extensive oral history from Mason. Under deposition questioning by defense counsel, Spare recounted essentially all of the facts that, according to this court, were not discovered by defense counsel.[1] Spare testified that Mason told him that his family life was "rather unusual," with his parents involved in "drug related activities as long as he could remember." *See*

---

[1] The deposition was conducted during the guilt phase of the trial in anticipation of Dr. Spare's potential absence for a possible penalty phase. The actual video tape of the deposition of Dr. Spare is in our record, as record entry 43 in the district court, referenced as Appendix Vol. 14 to the return of writ by the respondent, record entry 29. The volume number appears to be that assigned in the state trial court.

court shall not hold an evidentiary hearing on the claim unless the applicant shows that —

(A) the claim relies on —

    (i)  a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

    (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).

In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court interpreted § 2254(d)(1) as requiring a distinction between decisions that are "contrary to" and those that involve an "unreasonable application of" clearly established Supreme Court precedent. *Id.* at 405. A state court decision is "contrary to" Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Id.* A state court decision is also "contrary to" Supreme Court precedent if the state court "applies a rule that contradicts the governing law set forth" in that precedent. *Id.*

A state court decision involves an "unreasonable application of" clearly established Supreme Court precedent "if the state court identifies the correct governing legal rule

from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case." *Id.* at 407, 409, 413. We may not overturn a state decision simply because we conclude that the state court incorrectly applied Supreme Court precedent. The state court must have applied the relevant Supreme Court precedent in an objectively unreasonable manner. *Id.* at 411.

In reviewing a state court decision under AEDPA, we must look only to the Supreme Court holdings that existed at the time of the state court's decision. *Id.* at 412. We may not base our decision on Supreme Court dicta or the decisions of the courts of appeals. *See id.*; *Mitzel*, 267 F.3d at 530-31.

## A.  Denial of Expert Assistance

### 1.  Trial Phase

Mason first argues that the Ohio Supreme Court unreasonably applied clearly established Supreme Court precedent in "[p]remising [an indigent defendant]'s constitutional right to expert and investigative assistance solely on the discretion of the trial court without further review." Petitioner's Br. at 25. Indigent prisoners are constitutionally entitled to "the basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971) (citing *Griffin v. Illinois*, 351 U.S. 12 (1956)). Both *Britt* and *Griffin* involved requests for free transcripts of trial proceedings. *See Britt*, 404 U.S. at 226; *Griffin*, 351 U.S. at 13. The Supreme Court has also held that psychiatric assistance is a basic tool of an adequate defense in two general circumstances: (1) "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial," and (2) "in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." *Ake v. Oklahoma*, 470 U.S. 68, 74, 83 (1985). On appeal, Mason claims that *Ake* required Ohio to provide him with the following types of expert assistance: (1) a soil and debris expert to examine the soil found on the

that Cone's trial attorney presented no mitigating evidence at all and made no final argument; he did not even ask the jury to spare his client's life." *Cone v. Bell*, 243 F.3d 961, 978 (6th Cir. 2001) (Ryan, J.). In *Cone*, defense counsel failed to call a single witness to present mitigatory evidence and offered no closing statement, although defense counsel did briefly cross-examine some of the state's witnesses. *Cone*, 122 S. Ct. at 1848. Nevertheless, the Supreme Court, with only one dissent, held that defense counsel's representation during the penalty phase was not unconstitutionally inadequate under its standard in *Strickland v. Washington*, 466 U.S. 866 (1984).

Determining the best tactic for a penalty-phase presentation is extremely difficult in the wake of a jury's finding the defendant guilty of a horribly brutal act, according to the Court. *Cone*, 122 S. Ct. at 1852. This court's determination that a defense counsel's failure to present *any* affirmative case for mitigation in the penalty phase was unconstitutional ineffective representation failed to indulge the "'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that the particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Id.* at 1854. *See also Strickland*, 466 U.S. at 889.

In this case, defense counsel presented a significantly more robust mitigatory case than the counsel in *Cone*. Defense counsel called two members of the sheriff's department to comment on Mason's good behavior as a prisoner. Counsel also called Mason's mother, his two brothers, his cousin, and finally his wife to testify regarding how meaningful Mason had been in their lives and to ask the jury to spare the defendant's life. Finally, Mason himself testified about the artwork and poetry he had composed in prison. Unlike defense counsel in *Cone*, Mason's counsel delivered an extensive closing statement.

Defense counsel's presentation in the penalty phase is not the principal thrust of the court's concern regarding the

---

**DISSENT**

---

BOGGS, Circuit Judge, dissenting in part. I largely agree with the court's analysis of Mason's arguments in this case. I cannot agree, however, with the court's decision to remand this action to the district court for an evidentiary hearing on the adequacy of Mason's counsel's investigation and presentation of evidence in mitigation during the sentencing phase of Mason's trial. The court's action both ignores the clear Supreme Court precedent establishing the standards for evaluating the constitutionally required effectiveness of defense counsel and contravenes the statutory limitations on our review of state convictions through habeas corpus proceedings. Accordingly, I respectfully dissent from the court's decision to reverse the district court's denial of Mason's petition for a writ of habeas corpus and to remand for an evidentiary hearing on further mitigatory evidence that defense counsel could have offered.

This court has reversed capital sentences for failure to present or to investigate mitigatory evidence on no fewer than seven occasions. *See, e.g., Coleman v. Mitchell*, 268 F.3d 417, 438 (6th Cir. 2001); *Greer v. Mitchell*, 264 F.3d 663 (6th Cir. 2001); *Cone v. Bell*, 243 F.3d 961 (6th Cir. 2001), *rev'd*, 122 S. Ct. 1843 (2002); *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2001); *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997); *Austin v. Bell*, 126 F.3d 843 (6th Cir. 1997); *Glenn v. Tate*, 71 F.3d 1204 (6th Cir. 1995). The Supreme Court, in the course of reversing one such decision of this court, has made abundantly clear the extremely high standard that must be met for counsel's representation in the penalty phase to be considered constitutionally inadequate. The Supreme Court in *Bell v. Cone*, 122 S. Ct. 1843 (2002), reversed one iteration of this court's finding of inadequacy of counsel during the penalty phase. In our *Cone* decision, this court observed that counsel's presentation was not only poor, but a complete abdication of the defense attorney's role: "It is indisputable

clothing and shoes of Robin, Mason, and Chris; (2) a shoe-print expert to identify and compare the prints found in Robin's car with those made by the shoes of Mason, Robin, and Chris; (3) a mitigation-investigation expert to examine Mason's background for potential mitigation evidence; and (4) "an independent, competent forensic mental health expert" to help defense counsel at the sentencing phase. Petitioner's Br. at 28-33.

In this case, the Ohio Supreme Court understood *Ake* to "require that a criminal defendant be provided [nonpsychiatric] expert assistance when necessary to present an adequate defense." *Mason*, 694 N.E.2d at 943. This is consistent with the principle summarized in *Ake* that:

> Meaningful access to justice has been the consistent theme of these cases. We recognized long ago that mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process, and that a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense. Thus, while the Court has not held that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy, it has often reaffirmed that fundamental fairness entitles indigent defendants to "an adequate opportunity to present their claims fairly within the adversary system." To implement this principle, we have focused on identifying the "basic tools of an adequate defense or appeal," and we have required that such tools be provided to those defendants who cannot afford to pay for them.

*Ake*, 470 U.S. at 77 (internal citations omitted). The Ohio Supreme Court then held that nonpsychiatric expert assistance should be provided "only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial

of the requested expert assistance would result in an unfair trial." *Id.* at 944.

We are not persuaded that the Ohio Supreme Court applied *Ake* in an objectively unreasonable manner. In *Ake*, the Supreme Court weighed three factors in determining whether access to competent psychiatric assistance was required: (1) "the private interest that will be affected by the action of the State"; (2) "the governmental interest that will be affected if the safeguard is to be provided"; and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." *Ake*, 470 U.S. at 77. In this case, the Ohio Supreme Court simply stated that trial courts have discretion in evaluating the third factor. We do not believe that this application of *Ake* was objectively unreasonable. Therefore, bound as we are by the dictates of AEDPA, we hold that Mason is not entitled to habeas relief on this claim.

**2. Sentencing Phase**

Even if his sanity were not a significant issue during the trial, an indigent defendant on trial for his life has the right to psychiatric or psychological assistance during the sentencing phase "when the State presents psychiatric evidence of the defendant's future dangerousness." *Ake*, 470 U.S. at 83; *Skaggs v. Parker*, 235 F.3d 261, 272 (6th Cir. 2000), *cert. denied*, 122 S. Ct. 322 (2001). The State of Ohio did not present such evidence in this case. Therefore, Mason did not have a clearly established right to any psychiatric assistance at sentencing. Regardless of the fact that he was not entitled to such assistance, Mason alleges that the psychiatrist that the trial court did provide was inadequate. However, we have previously read *Ake* narrowly, holding that the issue is whether a defendant had "access to a competent psychiatrist in preparation of his defense," *Skaggs*, 235 F.3d at 267 n.2 (internal quotation marks omitted), and not whether the expert was in fact competent. *Id.* at 272. We did note in *Skaggs* that the failure of defense counsel to engage a competent

trial court then gave the *Allen* charge. Although the foreperson initially dismissed the possibility of a unanimous agreement, we note that his subsequent discussion of the supplemental instruction with the jury was followed by almost four more hours of jury deliberation instead of his return to the trial court with a confirmation of the jury's inability to reach a unanimous decision. This fact persuades us that the trial court did not err in giving an *Allen* charge.

We also believe that the jury was not coerced into returning a unanimous death sentence. First, the trial court's instructions did not require the jury to reject the death penalty unanimously before considering the life sentences. Indeed, the content of the jury's note — which indicated lack of unanimity "on any one of the sentencing options," J.A. at 1311 — strongly suggests that the jury discussed the three possible verdicts at the same time. Moreover, the trial court did not instruct the jury to continue deliberations, but to discuss whether it could do so. Finally, the jury deliberated for more than three hours after the trial court gave the *Allen* charge. The *Lowenfield* jury deliberated for only thirty more minutes. Given these circumstances, we conclude that the trial court's supplemental instruction was not impermissibly coercive. We therefore deny habeas relief with respect to this claim.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of Mason's petition for a writ of habeas corpus with respect to his conviction but **REMAND** the case for an evidentiary hearing regarding the claim of ineffective assistance of counsel at sentencing and for further proceedings consistent with this opinion.

*Mason*, 694 N.E.2d at 955.[21]   The Ohio Supreme Court then reiterated its approval of "using supplemental instructions urging jurors to continue deliberations to try to reach a unanimous penalty verdict" and specifically stated that such instructions in a death penalty case would not violate due process.  *Id.* (citing *Lowenfield*).   Noting that *Lowenfield* "expressly approved the use of *Allen* charges in capital cases," the district court concluded that the trial court did not err in giving "a single *Allen* charge." *Mason*, 95 F. Supp. 2d at 772.

Under AEDPA, the scope of our review is limited to determining whether a state court's decisions are "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).  Because violations of state law are not within our purview, we will review Mason's *Allen* claim only to determine whether the trial court's supplemental instruction was coercive "in its context and under all the circumstances." *Jenkins*, 380 U.S. at 446.  We hold that the *Allen* charge was not so coercive as to deny Mason his due process rights.

As a preliminary matter, we agree with the Ohio Supreme Court that the jury was not "irreconcilably deadlocked." *Mason*, 694 N.E.2d at 955.  The jurors in this case simply stated that they were "unable to reach a unanimous decision on any one of the sentencing options," J.A. at 1311, and the

---

[21]In *State v. Howard*, 537 N.E.2d 188 (Ohio 1989), the Ohio Supreme Court strongly criticized the "traditional" *Allen* charge for placing such emphasis on the jury's reaching a decision. *Id.* at 192. According to the *Howard* court, a traditional *Allen* charge essentially pressures dissenting jurors to change their minds and thus "subtly changes the requirement that the jury verdict be unanimous to one more closely resembling majority rule." *Id.*  The Ohio Supreme Court thus proposed a supplemental instruction that it believed would result in the "even-handed treatment of all jurors." *Id.* at 194.  Much of the supplemental instruction in this case follows the proposed *Howard* charge verbatim. Indeed, the trial court scrupulously maintained its neutrality by addressing the jurors as "jurors," J.A. at 1313, rather than distinguishing between "[j]urors for acquittal" and "jurors for conviction," as the *Howard* court had done. *Howard*, 537 N.E.2d at 195.

psychiatrist would be relevant in determining whether a defendant received ineffective assistance of counsel. *Id.* at 267 n.2.  With respect to Mason's *Ake* claim, however, we conclude that Supreme Court precedent has not clearly established a defendant's right to more than mere access to competent psychiatric assistance.

## B. Ineffective Assistance of Counsel

Mason argues that the Ohio Supreme Court unreasonably applied clearly established federal law in concluding that he was not deprived of his constitutional right to effective assistance of counsel.[4]   To establish that counsel afforded ineffective assistance, a petitioner must show that his attorney's performance was deficient, falling below an objective standard of reasonableness, and that such deficiency prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  The objective standard of reasonableness is a highly deferential one and includes "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689; *United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995) (placing the burden on the defendant to demonstrate a constitutional violation), *cert. denied*, 516 U.S. 1136 (1996).  To satisfy the prejudice requirement, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional

---

[4]The State of Ohio contends that various sub-parts of Mason's ineffective assistance claim were not raised on direct appeal and thus were procedurally defaulted.  Respondent's Br. at 25.  Mason replies that he raised these issues to the Ohio Supreme Court in his brief.  Final Reply Br. at 12; *see also* J.A. at 1517-18 (continuance), 1597 (expert assistance), 1598 (suppression motion), 1599 (jury selection).   The problem arises because Mason filed his petition for post-conviction relief while his direct appeal was pending.  Because the trial court found Mason's ineffective assistance claims to be barred by res judicata before the Ohio courts had decided his direct appeal, and because the Ohio Supreme Court eventually addressed the merits of Mason's ineffective assistance claims, we do not find procedural default and will review whether the state courts' adjudication was contrary to or involved an unreasonable application of *Strickland* and its progeny.

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Williams*, 529 U.S. at 391 (quoting *Strickland*, 466 U.S. at 694). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

### 1. Trial Phase

Mason claims that his attorneys provided ineffective assistance before trial in the following areas: (1) counsel failed to obtain certain expert and investigative assistance; (2) counsel failed to obtain the suppression of Mason's statements to the police during the February 10 and 12 interviews; (3) counsel failed to obtain a continuance; and (4) lead counsel was absent during parts of jury selection. He also claims that he received ineffective assistance during the trial due to defense counsel's failure to prepare adequately. Specifically, he argues that defense counsel (1) "fail[ed] to provide any guidance or direction to the jury in [his] opening statement" and "fail[ed] to object to inflammatory portions of the state's opening statement"; (2) "failed to develop and communicate a theory of defense and how such a theory related to mitigation"; (3) "failed to effectively litigate the state's failure to reveal exculpatory evidence"; (4) behaved in an overly aggressive manner; and (5) failed to object to the prosecutor's blatant misconduct. Petitioner's Br. at 67-68.

We first observe that Mason's attorneys had close to eight months to prepare for the trial, during which time they filed more than fifty pretrial motions and argued at several pretrial hearings. *Mason*, 694 N.E.2d at 947. Mason's ineffective assistance claim therefore relates to defense counsel's failure to achieve substantive results rather than a failure to file procedural motions. *Cf., e.g.*, *Olden v. United States*, 224 F.3d 561, 566-67 (6th Cir. 2000). However, *Strickland*'s objective standard of reasonableness does not require lawyers

Mr. McGuire:  Yes.

The Court:      Take the jury, please.

J.A. at 1313-14. Defense counsel objected to the supplemental instruction. The jury continued to deliberate until 5:15 p.m., when it broke for the evening. The jury returned to its deliberations at 8:35 a.m. on Wednesday, June 29, 1994. After fifteen minutes, the jury returned a unanimous recommendation that Mason be sentenced to death. The trial court then polled the jury, and each juror indicated agreement with that sentence.

Mason argues that the trial court's *Allen* charge forced a deadlocked jury to continue deliberation, in violation of his constitutional rights and contrary to Ohio law. The State of Ohio claims that the *Allen* charge was not unduly coercive. Furthermore, it contends that Ohio law did not preclude the supplemental instruction and that any violation of state law could not properly be raised in a habeas petition.

In evaluating the *Allen* charge, the Ohio Supreme Court first turned to *State v. Springer*, 586 N.E.2d 96 (Ohio 1992), which requires a trial court to impose an appropriate life sentence in the event of an "irreconcilably deadlocked" jury. *Id.* at 100. The state supreme court explained:

> No exact line can be drawn as to how long a jury must deliberate in the penalty phase before a trial court should instruct the jury to limit itself to the life sentence options or take the case away from the jury, as done in *Springer*. Each case must be decided based upon the particular circumstances. Here, after only four and one-half hours of deliberations, the trial court acted appropriately by giving a modified *Howard* charge [itself a modified *Allen* charge]. The circumstances show that the jury was not irreconcilably deadlocked, and the modified *Howard* charge did not coerce a death verdict.

You shall recommend the sentence of death if you unanimously, all twelve jurors, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors.

If you do not so find, you shall unanimously, all twelve, recommend either a life sentence with parole eligibility after serving twenty years of imprisonment or a life sentence with parole eligibility after serving thirty years of imprisonment.

J.A. at 1290. The trial court then read the three verdict forms that the jury would consider, with the express instruction that the jury not attach significance to the order in which the forms were read. The first verdict form recommended a death sentence, the second recommended a life sentence with parole eligibility after twenty years, and the third recommended a life sentence with parole eligibility after thirty years. The jury began its deliberation in the penalty phase of the trial at 3:50 p.m. on Monday, June 27, 1994, and broke for the evening at 5:05 p.m. The jury returned to the courthouse to continue deliberations at 8:45 a.m. on Tuesday, June 28, 1994. After a lunch break from 12:00 noon to 1:30 p.m., the jury informed the trial court that it was "unable to reach a unanimous decision on any one of the sentencing options." J.A. at 1311. After giving the jury a standard *Allen* charge, the trial court engaged in the following colloquy with the jury foreman:

The Court:    Is there a possibility, Mr. McGuire, that after an additional period of time you may reach an agreement? And this instruction that I have given you, and considering that with the rest of the instructions?

Mr. McGuire:  No.

The Court:    Would you wish to return to the jury room and discuss it, this instruction, with the jurors and then return and respond to that question?

to be perfect. Because defense counsel advocated with vigor on Mason's behalf, we hold that Mason did not receive ineffective assistance with respect to the filing of various procedural motions. As for the fact that Winkfield was absent during parts of jury selection, we agree with the district court that this argument is not compelling because Mason consented to the absences "and co-counsel conducted an effective voir dire" during that time. *Mason*, 95 F. Supp. 2d at 788.

Mason's argument that defense counsel failed to prepare adequately for the trial is somewhat stronger, but the record does not contain a great deal of information on this issue. Lead counsel Winkfield apparently acknowledged as late as a week or two before the trial that he had not personally interviewed any of the witnesses for either phase of the trial. J.A. at 1849 (Head Aff. at ¶ 9). He also declared less than a week before the trial started that "it would be great error for [him] to continue," J.A. at 673, because he was not prepared to go forward and "[could not] do so in good conscience and under the professional standards of the code of responsibility to [his] client." J.A. at 679. Co-counsel stated that he had prepared his part of the case but that he could not go forward without Winkfield. At this point, the trial court, distrusting defense counsel's motives, asked Winkfield whether he wanted to withdraw. When Winkfield answered that he "d[id]n't care to withdraw," the trial court stated its willingness to remove Winkfield and impose sanctions by not paying any fees. J.A. at 679. After a thirty-minute conference with Mason and co-counsel, Winkfield informed the trial court that he would stay on the case. Tr. at 700.

Although we acknowledge that attorneys' concerns about compensation may adversely affect their representation of clients, we are not persuaded that Winkfield's performance in this case was so deficient as to be objectively unreasonable. *Cf. Rickman v. Bell*, 131 F.3d 1150, 1157 (6th Cir. 1997) (holding that defense counsel, whose preparation for trial consisted solely of sixteen hours of interviews with the defendant, "total[ly] fail[ed] to actively advocate his client's

cause"); *Groseclose v. Bell*, 130 F.3d 1161, 1169-70 (6th Cir. 1997) (describing defense counsel's "failure to have any defense theory whatsoever" and "failure to conduct any meaningful adversarial challenge" as "especially appalling"), *cert. denied*, 523 U.S. 1132 (1998). First, despite Winkfield's protestations, the totality of the circumstances does not suggest that defense counsel was unprepared for the trial phase. Unlike the "complete lack of pretrial preparation" that the *Kimmelman* Court decried, 477 U.S. at 385, Winkfield and co-counsel filed numerous pretrial motions and argued several pretrial hearings. Although attorneys can always do more in preparation for a trial, we cannot conclude that Mason's attorneys did not prepare enough.

Second, we are not persuaded that the acts and omissions of defense counsel that Mason identifies as evincing a lack of reasonable professional judgment in fact violated prevailing professional norms. We have read the opening statements of both the prosecution and the defense and disagree with Mason's characterizations of them. We cannot identify any "inflammatory portions" of the prosecutor's statement, Petitioner's Br. at 67; conversely, we conclude that defense counsel provided adequate guidance to the jury by clearly articulating the theory that Chris rather than Mason should be on trial for Robin's murder. Mason's *Brady*-derived claim of ineffective assistance is simply too summary for us to review. As for the depiction of defense counsel as abusive and argumentative, we recognize that the record reveals considerable animosity between the prosecutor and defense counsel, but fail to see how the latter's advocacy prejudiced Mason's defense. Finally, any failure to object to prosecutorial misconduct did not constitute ineffective assistance of counsel because, as discussed below, we do not believe that the prosecutor acted improperly. We therefore deny habeas relief with respect to this claim.

## 2. Sentencing Phase

Under the Eighth Amendment, the jury in a capital case may "not be precluded from considering, *as a mitigating*

consideration of residual doubt during the sentencing phase. *Id.* at 173 & n.6 (plurality opinion); *id.* at 187-88 (O'Connor, J., concurring in the judgment); *see also Penry v. Lynaugh*, 492 U.S. 302, 320 (1989). Because Supreme Court precedent clearly establishes that Mason cannot support his residual doubt argument, we deny habeas relief with respect to this claim.

### 3. Failure to Remove the Death Sentence from the Jury

In *Allen v. United States*, 164 U.S. 492 (1896), the Supreme Court held that the trial court did not err in giving a supplemental instruction to a deadlocked jury. *Id.* at 501. The constitutionality of an *Allen* charge, sometimes referred to as a "dynamite" charge, turns on whether the charge in question was "coercive." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988).[20] An *Allen* charge must be reviewed "in its context and under all the circumstances." *Id.* at 237 (quoting *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)). Mason argues that the trial court's supplemental instruction to the jury during its deliberations at the penalty phase of the trial was an improper *Allen* charge.

The trial court gave the following preliminary instruction to the jury:

---

[20]In *Lowenfield*, the jury requested additional instructions after it became unable to reach a decision on the second day of deliberations. 484 U.S. at 234. The trial court then asked the individual jurors to answer in writing whether "further deliberations would be helpful in obtaining a verdict." *Id.* Eight jurors responded in the affirmative. *Id.* After denying a defense motion for a mistrial, the trial court directed the jury to return to the courtroom for further instructions. *Id.* At this time, the jury gave the trial court a new note that stated that some of the jurors had misunderstood his original question. *Id.* The trial court polled the individual jurors again, but asked whether they felt that "any further deliberations will enable you to arrive at a verdict?" *Id.* Eleven jurors responded in the affirmative. *Id.* at 235. The trial court then gave the jury an *Allen* charge. *Id.* Thirty minutes later, the jury returned a sentence of death. *Id.* The Supreme Court held that the polling of the jury and the supplemental instruction were not coercive as to violate the petitioner's constitutional rights. *Id.* at 241.

"mitigating circumstances" as "circumstances not constituting justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or punishment," *id.* at 590-91 (internal quotation marks omitted), the question before the Supreme Court was whether a sentence of death for the crime of rape was cruel and unusual punishment prohibited by the Eighth Amendment. *Id.* at 586. Indeed, the trial court gave the instruction pursuant to state statute. *Id.* at 589. *Coker* therefore provides no support for the due process claim that Mason must successfully make for us to review a challenged jury instruction.

Mason also contends that "the jury's discretion was not sufficiently guided under *Gregg v. Georgia*, 428 U.S. 153 (1976)." Petitioner's Br. at 137. *Gregg*, however, simply recommended that juries in death penalty cases be "apprised of the information relevant to the imposition of [the death] sentence and provided with standards to guide its use of the information." *Gregg*, 428 U.S. at 195. The trial court provided such guidance in this case; it instructed the jury of its duty to weigh aggravating circumstances against mitigating factors, the latter "including, but not limited to, the nature and circumstances of the offense and the history, character, and background of the Defendant, and any other factors that are relevant to the issue of whether the Defendant should be sentenced to death." J.A. at 1288. We agree with the Ohio Supreme Court that "the instructions, considered as a whole, adequately guided the jury and did not restrict its consideration of mitigating evidence." *Mason*, 694 N.E.2d at 953. We therefore deny habeas relief with respect to this claim.

### 2. Failure to Instruct on Residual Doubt

Mason argues that he was denied due process by the trial court's refusal to give a proposed instruction on residual doubt. In *Franklin v. Lynaugh*, 487 U.S. 164 (1988), a majority of the Supreme Court agreed that capital defendants do not have a constitutional right to demand jury

*factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Ohio law thus provides that, once the prosecution has proven one or more statutory aggravating circumstances beyond a reasonable doubt, the jury must weigh the aggravating circumstance(s) against the evidence in mitigation before imposing a death sentence. OHIO REV. CODE ANN. § 2929.04(B). Juries may consider as mitigating evidence "the history, character, and background of the offender," certain specified factors, and "[a]ny other factors that are relevant to the issue of whether the offender should be sentenced to death." *Id.* Moreover, a defendant is entitled to "great latitude" in presenting evidence of any and all mitigating factors. *Id.* § 2929.04(C).

The sole aggravating circumstance in this case was the rape. *See* OHIO REV. CODE ANN. § 2929.04(A)(7). When the trial court convened the penalty phase of Mason's trial on June 27, 1994, defense counsel offered the testimony of seven witnesses, as well as Mason's unsworn testimony, but did not inquire into mitigating evidence. The first two witnesses were deputy sheriffs from the Marion County Jail, who stated that Mason had not been a problem prisoner.[5] Defense counsel then called four members of Mason's family. Given no more direction than to speak on Mason's behalf, Mason's mother, brother, sister, and cousin simply asked the jury not to recommend the death penalty.

Defense counsel's direct examination of Mason's wife Terri ("Terri") was almost as perfunctory. Asked whether she had anything to tell the jury, Terri made an emotional plea for mercy. Counsel then asked Terri to identify a few pictures that Mason had drawn for her. On cross-examination, the prosecutor questioned Terri about Mason's art and his activities on the day that Robin disappeared. Redirect-,

---

[5] As Mason notes, defense counsel did not inquire about Mason's involvement in saving a fellow inmate from attempted suicide.

recross-, and further redirect-examination concerned Terri's interview with the police.  Defense counsel did not question Terri again about mitigating evidence.

Mason himself spoke as the last mitigating witness.  In his unsworn statement, he declared his innocence and requested that the jury "give me the chance to take it through the Appeals Courts."  J.A. at 1255.  Defense counsel questioned Mason about his drawings and then rested.  The prosecutor offered no evidence in rebuttal, but emphasized during his closing argument that defense counsel had not presented any mitigating evidence about Mason's history, character, or background.

### a.  Failure to Investigate or to Prepare Witnesses

Mason argues that defense counsel rendered ineffective assistance by failing to conduct an independent and thorough investigation of his life history and psychological background when his family members were available for interviews, thereby foreclosing the discovery of potential mitigating evidence.   He also contends that defense counsel's performance in preparing Mason's family members before calling them as mitigation witnesses was constitutionally deficient.

In examining Mason's claim of ineffective assistance at the sentencing stage, the Ohio Supreme Court inferred from the record "that defense counsel had voluminous records about [Mason's] history and background" and noted that "[c]ounsel prepared twelve exhibits documenting aspects of Mason's childhood, such as reports that he was beaten by his father and released by his parents to juvenile authorities, as well as early psychological evaluations, but did not present them to the jury."  *Mason*, 694 N.E.2d at 956.  The district court similarly deemed meritless Mason's claim "that his trial counsel improperly failed to investigate possible psychosocial mitigating factors that could have spared him the death penalty."  *Mason*, 95 F. Supp. 2d at 793.

review, errors on instructions are not reviewable unless they deprive a defendant of constitutional due process."  *Gall v. Parker*, 231 F.3d 265, 321 (6th Cir. 2000), *cert. denied*, 533 U.S. 941.  The question before us is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process."  *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

### 1.  Failure to Define Mitigation

Mason complains that the trial court failed to explain the meaning of "mitigation" or "mitigating factor," leaving the jury "to speculate throughout the trial as to what it was they were supposed to be considering."  Petitioner's Br. at 135.  We note as an initial matter that, contrary to Mason's claims, the Supreme Court precedent that existed prior to Mason's conviction did not clearly establish a defendant's due process right to a jury instruction on the definition of mitigation.[19]  Mason's reliance on *Coker v. Georgia*, 433 U.S. 584 (1977), is unavailing.  Although the trial court in that case did define

---

[19]Under *Buchanan v. Angelone*, 522 U.S. 269 (1998), the standard for reviewing jury instructions from the selection phase of a capital sentencing process is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Id.* at 276 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).  The Supreme Court has thus held that the Eighth and Fourteenth Amendments do not require a trial court to give a specific instruction on mitigating evidence, much less define what it means.  *Id.* at 277 (holding that a jury instruction to base the decision on "all the evidence" was constitutionally sufficient because it "afforded jurors an opportunity to consider mitigating evidence").  The only constitutional requirement is that the instructions do not preclude a capital jury from considering mitigating evidence.  *Id.* at 276; *see also Weeks v. Angelone*, 528 U.S. 225, 232 (2000).

We note that the instruction challenged in this case complied with the *Buchanan* mandate that a trial court should not restrict a jury's consideration of mitigating evidence.  However, *Buchanan* is not controlling because it was decided three and a half years after Mason's conviction, and, under AEDPA, Supreme Court precedent must be in existence prior to a conviction to control a habeas court's analysis.  *See Williams*, 260 F.3d at 703.

### 4. Extrinsic Evidence

This case involves an out-of-court investigation similar to the one in *Doan*, in which a juror put lipstick on her arm to simulate a bruise and then determined that such a bruise could be seen in a darkened room. *Doan*, 237 F.3d at 727. In this case, juror Mary Downs ("Downs") disassembled her husband's revolver to see whether the grip looked like the one shown in court. The juror stated that she conducted this experiment and informed other jurors after the jury had returned a guilty verdict. However, Beckholt, who did not participate in the jury's deliberations, testified that Downs reported her results during the trial. The trial court found that Downs's actions "did not influence the verdict in this case and as such, [Mason] was not prejudiced by this conduct." J.A. at 1487-88.

We review constitutional errors at trial such as Sixth Amendment violations under a harmless error standard. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Doan*, 237 F.3d at 736. The habeas petitioner must show that the trial error "had substantial and injurious effect or influence in determining the jury's verdict." *Doan*, 237 F.3d at 736 (quoting *Brecht*, 507 U.S. at 637). Although Downs's presentation of her out-of-court findings may have been constitutional error, Mason cannot demonstrate that it substantially affected or influenced the jury's verdict. The evidence at trial was more extensive than the gun grip that was the subject of Downs's experiment; in fact, the alleged murder weapon was the wooden board with nails attached to it. We therefore deny habeas relief with respect to this claim.

### H. Sentencing Phase Instructions

Mason claims that the trial court's instructions to the jury led to "an unreliable sentencing determination." Petitioner's Br. at 135. Specifically, he argues that the trial court committed constitutional error by (1) failing to define "mitigation" or "mitigating factor," (2) refusing to instruct the jury on residual doubt, and (3) failing to remove the death sentence from an allegedly deadlocked jury. "On habeas

Much has been made in this case of the twelve exhibits that defense counsel prepared in conjunction with the videotaped deposition of Dr. Joseph T. Spare ("Spare"), the psychiatrist appointed by the trial court to assist the defense with the mitigation phase. The mere existence of mitigation exhibits, however, is not conclusive, because the question under *Strickland* is whether defense counsel's investigation into potential mitigation evidence was constitutionally adequate:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
>
> . . .
>
> [W]hat investigation decisions are reasonable depends critically on [the information that the defendant supplies]. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions.

*Strickland*, 466 U.S. at 690-91. We have previously held that the complete failure to investigate mitigating evidence constitutes ineffective assistance of counsel. *See Austin v.*

*Bell*, 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 *and* 523 U.S. 1088 (1998); *cf. Scott v. Mitchell*, 209 F.3d 854, 881 (6th Cir.) ("Without effective research into the available mitigating testimony, of course, it would be impossible for the lawyers to have made an informed decision either way."), *cert. denied*, 531 U.S. 1021 (2000). We have also emphasized the importance of an independent investigation: "The sole source of mitigating factors cannot properly be that information which [a] defendant may volunteer; counsel must make some effort at independent investigation in order to make a reasoned, informed decision as to their utility." *Carter v. Bell*, 218 F.3d 581, 596 (6th Cir. 2000).

The record before us is inadequate for a meaningful review of Mason's claim of ineffective assistance of counsel. We recognize that the *Strickland* Court directed state courts "to analyze effectiveness based on the then prevailing norms and counsel's perspective at the time," *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001), which entails a "highly deferential" standard. *Strickland*, 466 U.S. at 689. However, in order for us to evaluate whether defense counsel rendered constitutionally ineffective assistance at sentencing, we must know more about the extent of counsel's investigation and preparation of mitigating evidence. There is a significant likelihood that defense counsel acted unreasonably in failing to conduct an independent and thorough investigation of Mason's background. Because the record as it now stands reflects disputes about defense counsel's performance with respect to the sentencing phase of Mason's trial, we remand the case to the district court for an evidentiary hearing on this issue.[6]

---

[6] Judge Boggs suggests that Mason does not meet the requirements for an evidentiary hearing as laid out in 28 U.S.C. § 2254(e)(2). Although subsection (e)(2)'s conditions are, indeed, onerous, "only a prisoner who has neglected his rights in state court need satisfy these conditions." *Michael Williams v. Taylor*, 529 U.S. 420, 435 (2000). In determining whether § 2254(e)(2) applies, the question is not whether the petitioner has succeeded in developing the record, but whether the petitioner has

and I felt that people were making — if they were judging — making judgmental comments of that sort, how could they fairly judge the case?" J.A. at 1401. Beckholt, however, did not participate in the jury's deliberations. Because Mason does not offer any evidence other than that which the trial court had at the time it made its factual finding, we deny habeas relief with respect to this claim.

### 2. Presumption of Guilt

Mason alleges that juror Russell L. Dennis expressed belief in Mason's guilt before formal deliberations began. When questioned about such a statement, the juror acknowledged saying, "Maybe he's pleading guilty," J.A. at 1378, but testified that he "really . . . hadn't formed an opinion. It was just wishful thinking because it was late in the day and everybody was tired." J.A. at 1380. The trial court found "no substantial evidence that any juror made any comment during the trial which demonstrated that he or she had failed to keep an open mind so as to be able to fairly decide the evidence in this case." J.A. at 1487. Absent clear and convincing evidence to the contrary, we must defer to the state court's factual finding, and therefore deny habeas relief with respect to this claim.

### 3. Sleeping During Trial

Mason alleges that juror Wanda Straub ("Straub") fell asleep during the trial. The record is unclear as to whether the juror slept during proceedings in the courtroom or during breaks in the jury room. However, Straub averred that she "was awake and attentive during all proceedings of the trial." J.A. at 1479 (Straub Aff. at ¶ 2). The trial court made the same finding with respect to all twelve jurors. Absent clear and convincing evidence to the contrary, we must defer to the state court's factual finding, and therefore deny habeas relief with respect to this claim.

impair Mason's ability to receive a fair trial. We must presume that the trial court's factual determinations are correct unless Mason rebuts that presumption with clear and convincing evidence.

### 1. Racial Slurs

Mason argues that he was denied a fair trial because of the racial prejudice of an all-white jury, which manifested itself through generalizations about race[16] and the use of black slang.[17] Individual jurors were disturbed by the racist comments but apparently did not understand that they could do anything about it. After reviewing the affidavits of all twelve jurors[18] and hearing testimony from the court bailiff, three jurors, and an alternate juror, the trial court found that "[a]t no time during the trial did any of the jurors participate in any acts of racism which could have impaired [Mason's] ability to receive a fair trial." J.A. at 1487.

The question on habeas is whether Mason can rebut the presumption that the state court's factual findings are correct. Alternate juror Mary Beckholt ("Beckholt") testified that the racist comments, in her opinion, could have violated Mason's right to a fair trial: "I felt it was unfair. I felt it was wrong,

---

[16] Alternate juror Mary Beckholt testified to jurors' comments during the trial that "all black people did was drink and party and do beer runs." J.A. at 1384.

[17] Mason apparently wears a "dew rag" or bandana on a daily basis. J.A. at 773. Juror Kathy Haney testified that a juror made "racist remarks and [talked] in a jive manner" about "dew rags," as well as ridiculed Mason's speech. J.A. at 1412-13. Juror Jason Mahaffey ("Mahaffey") testified that the same juror had "said he had to go get his dew rag, cause he doesn't have a hat; he just has a dew rag." J.A. at 1407-08. However, Mahaffey did not characterize the comment as "racial." J.A. at 1407.

[18] The prosecutor and defense counsel obtained these affidavits without consulting the trial court. The joint appendix contains the affidavits of ten jurors who denied participating in or observing any racism.

---

We begin our analysis of Mason's ineffective assistance claim by reviewing the investigation that apparently did take place. In the fall of 1993, soon after Mason was charged with the rape and aggravated murder of Robin, the trial court issued an order appointing an investigator for the defense and authorizing independent DNA testing. J.A. at 1954-55.[7] According to the Ohio Supreme Court:

> The defense team of two lawyers and an investigator looked fully into Mason's background. Moreover, the state had collected and released to the defense in January 1994 voluminous records concerning Mason, including records about his last nine years in and out of prison as well as school records and juvenile incarcerations.

*Mason*, 694 N.E.2d at 945. The record, however, suggests that the investigator's assignment was limited to interviewing witnesses and taking measurements at the crime scene. Tr. at 35-39. Because the case against Mason was based on circumstantial evidence, we infer from the record that the witness interviews were primarily about the facts surrounding Robin's disappearance and murder. Defense counsel indicated as much when the trial court asked why a mitigation expert was necessary given the appointment of an investigator. Tr. at 452. Furthermore, Mason averred that his conversations with defense counsel and the investigator "were

---

diligently attempted to do so. *See M. Williams*, 529 U.S. at 432 ("[A] failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."). Mason here has been sufficiently diligent; as the Supreme Court explained, "Diligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437. Mason requested (and was denied) a hearing in state court and has actively sought to expand the record. We see no lack of diligence, so we do not apply § 2254(e)(2).

[7] The trial court later authorized independent laboratory testing on a sample of the fetus that Robin was carrying at the time of her murder and independent blood testing of the blood found on Mason's shoe. J.A. at 1955.

almost exclusively about trial phase issues — concerning witnesses, my whereabouts, Chris Dennis and other theories of who had killed Robin Dennis." Maurice A. Mason Aff. at ¶ 5. Mason's family members were also not interviewed about Mason's background. J.A. at 1992 (Terri A. Mason Aff. at ¶ 14); J.A. at 1997 (James Michael Mason Aff. at ¶ 9); J.A. at 2006 (Mioshi Mason Aff. at ¶¶ 13-14).[8]

As for the documents obtained during discovery, the trial court found that defense counsel "had in their possession and had reviewed, prior to trial, over 3,000 pages of comprehensive records and documents regarding [Mason]'s social history, including records from the Marion City Schools, Marion Area Counseling Center, Marion County Children's Services, Marion County Adult Probation Department, Adult Parole Authority, and Ohio Dept. of Rehabilitation and Corrections." *State v. Mason*, No. 93-CR-0153, slip op. at 9-10 (Ohio Ct. Com. Pl. Nov. 21, 1996). None of these documents is in the record before us.

In May 1994, before this case went to trial, the trial court appointed Dr. Spare and a forensic pathologist to assist the defense. J.A. at 1955. Dr. Spare then examined Mason and prepared a five-page psychiatric report. J.A. at 1952. On June 7, 1994, during the trial, defense counsel deposed Dr. Spare on videotape, using twelve mitigation exhibits. These exhibits, according to the record as it stands, appear to have been based largely on the discovery provided by the prosecution to defense counsel.[9] As noted above, defense

___

[8]Lead counsel acknowledged less than a week before the trial began "that he had not personally interviewed any of the witnesses for either phase of the trial." J.A. at 1848, 1849 (Head Aff. at ¶¶ 6, 9). Moreover, counsel apparently never studied Mason's "psychological or environmental history" and failed to prepare the "social history" that would have humanized Mason before the jury. J.A. at 1856 (Schumacher Aff. at ¶¶ 24C, 24E).

[9]Although the trial court ordered the retention of these exhibits as part of the record, the exhibits are not in the record before us.

## G.  Juror Bias/Misconduct

The Sixth and Fourteenth Amendments to the Constitution guarantee a criminal defendant the right to an impartial jury. *Morgan v. Illinois*, 504 U.S. 719, 726 (1992). Under clearly established Supreme Court precedent, a defendant who alleges implied juror bias is entitled to a hearing in which he has "the opportunity to prove actual bias." *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Dennis v. United States*, 339 U.S. 162, 171-72 (1950). However, pursuant to Ohio Rule of Evidence 606(B), evidence of statements made during the course of jury deliberations is not admissible, a rule in keeping with the general theory that jurors are incompetent witnesses of their own misconduct. A juror may testify about "extraneous prejudicial information" or "outside influence." *Id.* We recently held that the Ohio courts' application of this statute to dispose of biased jury claims violated clearly established Supreme Court precedent that recognizes the fundamental importance of a defendant's constitutional right to a fair trial. *Doan v. Brigano*, 237 F.3d 722, 732 (6th Cir. 2001). In *Doan*, we concluded that a juror's presentation of an out-of-court experiment to other jurors was constitutional error, but that this error was harmless. *Id.* at 739.

In this case, Mason alleges that juror bias or misconduct resulted when various jurors (1) made racial slurs, (2) presumed Mason's guilt, (3) slept during trial, and (4) conducted and then presented an out-of-court investigation. The first three involve internal influences, and under *Tanner v. United States*, 483 U.S. 107 (1987), testimony on those subjects should have been barred by the evidentiary rule prohibiting juror impeachment of a jury verdict. *Id.* at 121; *cf. United States v. Logan*, 250 F.3d 350, 380 n.2 (6th Cir.) (recognizing the difference in how the *Doan* and *Logan* panels framed the issue), *cert. denied*, 534 U.S. 895 (2001). However, under *Doan*, the question is whether Mason received a fair trial. Mason did have an opportunity to prove actual bias when the trial court heard oral arguments on his motion for a new trial. The trial court denied the motion, finding that the jurors' conduct did not

improperly. *Mason*, 694 N.E.2d at 951. Mason has thus waived the right to federal habeas review on all but one of his prosecutorial misconduct claims unless he can demonstrate cause and prejudice or make "a showing of a fundamental miscarriage of justice." *Hinkle*, 271 F.3d at 245 (quoting *Simpson*, 238 F.3d at 406).

Mason argues that "the prosecutor engaged in ongoing misconduct" during cross-examination by "attacking counsel's defense strategies[,] over which Mason had no control." Petitioner's Br. at 110. One of the prosecutor's questions concerned Mason's extramarital relationship with Robin: "Is that the same reason that when this case started, in order to contest the DNA results, you had your attorneys do independent testing to see if our DNA results were right?" J.A. at 1092. Defense counsel raised an objection, which the trial court overruled. We agree with the district court that this question was not improper. The credibility of a criminal defendant who testifies may be impeached like that of any other witness. *Greer*, 264 F.3d at 683. The question about Mason's reason for conducting independent DNA testing followed his testimony about a statement to the police in which he denied knowing Robin or ever being alone with her. The prosecutor was thus impeaching Mason by showing inconsistencies between his pretrial statement to the police and his testimony at trial.

Mason argues on appeal that another question, pertaining to his failure to produce records that showed his employment at the local festival where he met Robin, demonstrates misconduct, as do the prosecutor's "ridicul[ing] each of the defense theories" during his closing argument for the liability phase, Petitioner's Br. at 111, and his closing argument for the penalty phase. We first note that defense counsel made no contemporaneous objections. The Ohio Supreme Court reviewed for plain error, *Mason*, 694 N.E.2d at 951, thus barring federal habeas review absent a showing of cause and prejudice. We are not persuaded that Mason has shown cause and prejudice to excuse the procedural default and therefore deny habeas relief with respect to this claim.

---

counsel apparently never interviewed anyone, including Mason himself, about possible mitigating aspects of Mason's background, even though various family members were ready and willing to discuss his life history.[10]

Although the Ohio Supreme Court did not make an explicit finding about the extent of defense counsel's independent investigation of mitigating evidence, it did conclude that defense counsel, in choosing not to present whatever mitigating evidence was known, made a strategic decision to foreclose the state from introducing negative evidence in rebuttal. *Mason*, 694 N.E.2d at 956. Under *Strickland*, however, courts must first determine whether defense counsel's investigation decisions were reasonable. Only then may they reject a defendant's challenge to any decision characterized as strategic by defense counsel.

Had trial counsel conducted an adequate investigation, the jury would have heard substantial evidence about how drug use and violence pervaded Mason's background and life history. From the record before us,[11] we have learned that Mason's alcoholic parents were heavy marijuana users and drug dealers from the time Mason was four or five years old. Indeed, Mason's mother admitted "that for the majority of

---

[10] This fact distinguishes this case from *Martin v. Mitchell*, Nos. 00-3357, 00-3359, 2002 WL 197963 (6th Cir. Feb. 7, 2002), where we recently denied habeas relief on a similar claim because the petitioner had not shown what potential mitigating witnesses "would have testified to, or how such testimony could have aided him at sentencing." *Id.* at *11; *cf. Buell v. Mitchell*, 274 F.3d 337, 361 (6th Cir. 2001). The testimony in this case concerned Mason's troubled childhood, as described below, which would have aided him at sentencing because it did not give the prosecutor the same opportunity for rebuttal that evidence about good character or rehabilitation potential could have.

[11] Affidavits were submitted by (1) James Frederick Crates ("Crates"), a mitigation specialist who was retained by post-conviction counsel and who interviewed Mason's mother before her death, (2) Dr. Jeffrey L. Smalldon ("Smalldon"), a psychologist, (3) Mason's father, and (4) Mason's sister.

[Mason]'s life the family home was a 'drug house.'" J.A. at 1874 (Crates Aff. at ¶ 20S). Four years later, Mason began to experiment with drugs, stealing marijuana and pills from his parents' supply for his own use; by age eleven, he had become a significant user himself. About this time, Mason accompanied his father on trips out-of-state to buy drugs. By age fourteen, Mason began to use drugs with his parents; he also ran away from home. In addition to drugs, violence overran the Mason household. Mason's parents struggled through repeated bouts of domestic violence in front of their children; they also beat Mason on a regular basis for stealing their drugs and for the misconduct of his siblings, for which he was blamed.

Having received official documents from the prosecution during discovery, trial counsel appears to have been aware of some of this evidence. Mitigation Exhibit 10, for example, apparently concerned Mason's drug use as a teenager, *see Mason*, No. 93-CR-0153, slip op. at 5, but not his significant use at a much earlier age. We emphasize that the discovery documents by their very nature only concerned the Mason family's limited contacts with the authorities. For example, a record from Marion County Children's Services indicates that Mason's father was charged with assault in 1977 for beating Mason. J.A. at 1874-75 (Crates Aff. at ¶ 20W). This charge, however, stemmed from a missing person report that Mason's father himself filed with the police; Mason had run away while being disciplined. J.A. at 2000-01 (James Michael Mason Aff. at ¶ 31). The authorities do not appear to have been aware of the regular whippings that Mason suffered. Furthermore, Mason's mother never reported episodes of domestic abuse to the police, because it was "a no-no in our family . . . to call the cops . . . [W]e didn't want them around." J.A. at 1871 (Crates Aff. at ¶ 20H). Mason's mother also did not go to the hospital, where social services may have intervened and documented the Mason family's plight.

Therefore, the documents provided by the prosecution to defense counsel could not have contained anything close to

require reversal. *Boyle v. Million*, 201 F.3d 711, 717 (6th Cir. 2000). We have previously identified four factors that are relevant in analyzing a claim of prosecutorial misconduct:

> In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive, whether they were deliberately or accidentally placed before the jury[;] and the strength of the competent proof to establish the guilt of the accused.

*Hill v. Brigano*, 199 F.3d 833, 847 (6th Cir. 1999) (quotation omitted). We review a prosecutorial misconduct claim for harmless error. *Id.*

We first note our previous holding "that Ohio's contemporaneous objection rule constitutes an adequate and independent state ground that bars federal habeas review absent a showing of cause and prejudice." *Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001). "Moreover, we view a state appellate court's review for plain error as the enforcement of a procedural default." *Id.* "In determining whether state courts have relied on a procedural rule to bar review of a claim, we look to the last reasoned opinion of the state courts and presume that later courts enforced the bar instead of rejecting the defaulted claim on its merits." *Id.* (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)).

Mason presented numerous claims of prosecutorial misconduct to the district court, which found them to be procedurally barred. *Mason*, 95 F. Supp. 2d at 779-85. Defense counsel failed to make contemporaneous objections to most of the alleged instances of prosecutorial misconduct. Therefore, in the last reasoned opinion by a state court reviewing these claims, the Ohio Supreme Court expressly enforced Ohio's contemporaneous objection rule and reviewed for plain error. *Mason*, 694 N.E.2d at 951.

Defense counsel did object to a question about DNA testing. Addressing this claim on the merits, the Ohio Supreme Court held that the prosecutor had not acted

trial court had allowed Mason "to present some evidence that tended to show the criminal propensity of Chris Dennis," including testimony about two incidents when Chris struck Robin in the face. *Id.*

We recently considered the Confrontation Clause in *Boggs v. Collins*, 226 F.3d 728 (6th Cir. 2000), *cert. denied*, 532 U.S. 913 (2001). Although that case was decided under pre-AEDPA standards, it is still instructive. The *Boggs* court noted that courts had found Confrontation Clause violations when defense counsel had advanced "an articulated theory that a witness had a motive to fabricate." *Id.* at 741. The record in this case, to the extent that Mason's attorneys based the defense on residual doubt, only barely suggests that they pursued a bias theory at trial. The trial court consistently framed the question as one of propensity, and defense counsel did not suggest otherwise. We thus conclude that Mason has failed to show that the Ohio Supreme Court unreasonably applied clearly established Supreme Court precedent in upholding the trial court's exclusion of certain evidence of Chris's violence.

**F. Prosecutorial Misconduct**

Mason argues that "[t]hroughout the trial and penalty phases, the prosecutor engaged in egregious misconduct designed to prejudice Mason and to inflame the passions of the jury, thus depriving Mason of due process and a fair trial." Petitioner's Br. at 108. The relevant question in cases of alleged prosecutorial misconduct is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[T]he misconduct must be so pronounced and persistent that it permeates the entire atmosphere of the trial or so gross as probably to prejudice the defendant." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (internal quotation marks and citation omitted). A claimant must establish that the challenged statement was both improper and so flagrant as to

the amount of mitigating evidence that could have been and later was obtained in an independent and thorough investigation.[12] Indeed, we find it particularly telling that not even the trial court referred to any knowledge on the part of trial counsel about Mason's troubled childhood or the extent to which drugs and violence ravaged Mason and his family. We believe that it was just this evidence, which did not enter the record until the post-conviction stage, that was Mason's best hope. As we observed in *Mapes v. Coyle*, 171 F.3d 408 (6th Cir.), *cert. denied*, 528 U.S. 946 (1999), the information about Mason's background may amount to little more than "slim evidence of mitigation, but it is *something*. And what is most important, it was [his] *only* shield from a death sentence." *Id.* at 426. Yet trial counsel does not appear to have made any independent effort to investigate the particulars of Mason's history, character, or background.[13]

_____

[12] Contrary to the dissent's analysis, the problem here is not that defense counsel had no knowledge of Mason's background, but that, after receiving a limited amount of that information in materials provided by the prosecution, defense counsel may not have adequately investigated the matter further themselves. Our concern is that the limited information obtained by defense counsel did not *discharge* counsel's duty to investigate, but *triggered* the duty to investigate.

[13] We find inexplicable the apparent failure of trial counsel to investigate mitigating evidence in this case. Four months before trial, the trial court heard oral argument on defense counsel's request for various experts, including "a mitigation expert team of Psychologist, Social Worker, and Mitigation Expert." Tr. at 412. Defense counsel called Dale A. Baich ("Baich"), then an assistant public defender for the State of Ohio, to testify about a defendant's need for mitigation experts. Baich described the mitigation expert's responsibilities as follows:

One significant role of the mitigation expert is to interview Mr. Mason about his background and then go out to interview family members, friends, acquaintances. In addition, it's important for the mitigation expert to gather records that may be existing related to Mr. Mason. I have no idea about Mr. Mason's background, but there may be some governmental records related to him that would be helpful to the defense. His school records and work records may be important for the mitigation phase.

So in a sense, the mitigation expert is the one that goes out

The alleged failure of defense counsel to prepare Mason's family members for their testimony at sentencing further demonstrates that counsel conducted an inadequate investigation of mitigating evidence.

Trial counsel's failure to conduct an independent and thorough investigation may have hampered their ability to make strategic decisions at sentencing; it may also have affected their ability to give competent advice to Mason about the meaning of mitigation evidence and the availability of possible mitigation strategies. Indeed, according to Mason, trial counsel did not offer any such advice:

> Neither of my lawyers ever explained to me what the mitigation trial is or what it was intended to prove. I had no knowledge that mitigation was intended to save my life, or that this was to be the only opportunity for me to demonstrate to the jury why I should not be given the death penalty.

Maurice A. Mason Aff. at ¶ 7. The evidence in mitigation that was so readily available in this case offered an arguably reasonable probability of "humaniz[ing Mason] before the jury such that at least one juror could have found he did not deserve the death penalty." *Carter*, 218 F.3d at 592. Because we cannot determine from the record before us whether the Ohio Supreme Court applied *Strickland* unreasonably by not

---

and conducts a complete family and personal background investigation on the accused.

Tr. at 421. Trial counsel understood that relying on the documents produced by the prosecution was inadequate, because interviews still had to be taken of Mason and the "significant others in his life," and the prosecution could have missed some records. Tr. at 423-25. The prosecutor argued that defense counsel had been provided with all available records and that Mason was fully able to assist in his defense. Tr. at 442-43, 446. Given defense counsel's understanding of the need for further investigation, we strongly believe that counsel may have afforded Mason ineffective assistance by unreasonably deciding not to investigate. We leave it to the district court in the first instance to determine after holding an evidentiary hearing whether the performance of defense counsel in this case failed to meet the constitutional minimum.

Mason. Mason was allowed to present evidence of and to cross-examine Chris about Chris's heavy drinking and violent tendencies, including two incidents of wife-beating. *See Mason*, 95 F. Supp. 2d at 779. The trial court also permitted defense counsel to present evidence of and to cross-examine Chris about an alleged threat to kill Robin on the day that she disappeared. The jury also learned on both direct and cross-examination of Chris that Robin had made him the beneficiary of her life insurance policy. However, the trial court ruled that evidence about Chris's history of assaults was inadmissible because it was proffered by Mason only for the purpose of showing that Chris acted in conformity with the prior acts and was therefore likely to have murdered Robin.

Mason's first Confrontation Clause argument appears to have been that the evidence should be admitted to prove identity. Defense counsel alleged that Chris had previously beaten a person and "left [that person] for dead in a field," J.A. at 758, just as Robin was left in an abandoned rural area. However, he also argued in the alternative that Chris's violent acts should be admitted "not as specific instances to impeach credibility, but to show possibility of intent, motive, [and] similar modus operandi." J.A. at 758-59. Finally, defense counsel wanted to impeach Chris's credibility by showing "other inconsistencies and what we believe to be untruths and/or lies." J.A. at 759; *see also* J.A. at 785 (contending during opening argument that "Chris Dennis has lied about certain aspects of this case from the very beginning"). *But see* J.A. at 1593 (arguing, in Mason's brief to the Ohio Supreme Court, that "[t]he jury was not being asked to consider this evidence as impeaching").

Neither the Ohio Supreme Court nor the district court examined Mason's Confrontation Clause claim as such, holding instead that the evidence was not admissible under Ohio Rule of Evidence 404(A), which bars the use of propensity to prove conduct. The Ohio Supreme Court first rejected Mason's argument that Rule 404 should not apply to Chris because he was a witness rather than a defendant on trial. *Mason*, 694 N.E.2d at 950. It then observed that the

constrain the right to present evidence. Mason claims that his right to a fair trial should control.

In *Chambers v. Mississippi*, 410 U.S. 284 (1973), the Supreme Court proclaimed that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302. The right to present witnesses, however, is not absolute. "In the exercise of this right, the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Id.* Mason does not argue that the Ohio rule barring evidence of prior bad acts is unfair or unreliable. Instead, Mason contends that this rule's protection should extend to defendants but not to witnesses. We are not persuaded that any such proposition is clearly established federal law as determined by the Supreme Court, and therefore decline to grant habeas relief on this ground.

Mason also argues that evidence of Chris's violent tendencies was admissible to show his bias or motive in testifying for the prosecution. The Supreme Court has recognized a defendant's constitutional right to test the credibility of witnesses through cross-examination. *See Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *see also Chambers*, 410 U.S. at 295. Forbidding inquiry into a witness's bias can violate the Confrontation Clause. *Delaware v. Van Arsdall*, 475 U.S. 673, 679-80 (1986). However, a trial court retains discretion to limit the scope of cross-examination, based on concerns such as "harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant." *Id.* at 679. In short, the Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).

In this case, Mason's defense at trial was that Chris had murdered Robin. It was thus in Mason's interest to demonstrate Chris's bias and motive for testifying against

examining the extent of trial counsel's investigation into mitigating evidence, we remand the case to the district court with the instruction to hold an evidentiary hearing on Mason's claim of ineffective assistance at the sentencing phase of his trial.

### b.  Failure to Present Mitigating Evidence

Next, Mason challenges defense counsel's decision to present a limited mitigation case, when the record as it stands before us indicates that Mason grew up in a dysfunctional family and was repeatedly exposed to violence and drug use from childhood, leading to emotional and psychological problems. We have noted above that much of this evidence does not appear to have been known to trial counsel, due to their alleged failure to conduct an independent and thorough investigation of potential mitigating evidence. Mason contends, however, that he would not have received the death penalty from any jury that heard what mitigating evidence was available.

By the time of sentencing, defense counsel had deposed Dr. Spare and prepared the twelve mitigation exhibits. They originally planned to offer as mitigating evidence the testimony of Dr. Spare, who concluded, based on Mason's past conduct, that Mason was unlikely to be a repeat violent offender. Defense counsel ultimately decided not to present this evidence, which, according to the prosecutor, was omitted in order to foreclose rebuttal evidence about Mason's history of violent conduct, allegedly including rape, brandishing a gun, resisting arrest, and burglary. Lead counsel informed the trial court that the decision not to present mitigation evidence was strategic:

We have the consideration of Maurice Mason's life, you know, here today, and some strategies that we calculated and designed to procur[e] and achieve a life verdict even with the decision that was rendered by the jury. We are not interested in bringing up certain things or opening the door for certain things that the Prosecution has evidence, a great desire to bring before the jury.

J.A. at 1209.

The Ohio Supreme Court held that defense counsel's performance at the sentencing stage was not deficient because "the records [showed] prior involvements with the criminal and juvenile justice systems, and other unfavorable matters. Mason could not have presented evidence as to his good character and rehabilitation potential without risking the introduction of negative evidence by the state in rebuttal"; it also concluded that Mason had not shown prejudice. *Mason*, 694 N.E.2d at 956. The district court focused more directly on the "possible mitigating effects of [Mason's] unfortunate childhood," *Mason*, 95 F. Supp. 2d at 777, but reached the same conclusion:

> [Mason] has not suggested the existence of any mitigating factor that is not overwhelmingly negated by his history of violent criminal conduct, including a prior rape and firearms offenses, multiple parole violations, and multiple drug offenses stretching as far back as elementary school. [Mason]'s counsel's strategy of not presenting mitigating testimony in order to keep [Mason]'s extensive criminal history from the jury was objectively reasonable. Nor has [Mason] shown prejudice; on this record, Mason cannot show a reasonable likelihood that any juror who was apprised of [Mason]'s complete psychosocial history — including his prior criminal record — would not have voted for the death penalty.

*Id.* at 793 (internal citation omitted).

In rejecting Mason's claim of ineffective assistance at sentencing, the district court relied on *Scott*, in which we held that defense counsel's decision not to present mitigating evidence was reasonable in light of the petitioner's extensive criminal history, which included "commission of robbery, assault, kidnaping, and other violent acts upon innocent citizens." *Scott*, 209 F.3d at 880. The potential mitigating evidence in that case, as found by the state court after a post-conviction evidentiary hearing, consisted of testimony about

voluntarily agreed to answer the police's questions. Mason has not demonstrated that this determination was an unreasonable application of federal constitutional law to the facts of his case. We thus deny Mason habeas corpus relief with respect to this claim.

"Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Miranda*, 384 U.S. at 478. The Ohio courts found that Mason's statements were voluntary. *Mason*, 694 N.E.2d at 946. Because Mason has not presented clear and convincing evidence to the contrary, we defer to the state courts' factual finding and hold that their application of *Miranda* was not objectively unreasonable.

## E. Right to Confront Witnesses and to Present a Defense

Mason argues that the trial court violated his right to confront the prosecution's witnesses and to present a defense by restricting cross-examination of Chris, who had a history of violent assaults on Robin and others. Mason asserts that the Ohio Supreme Court's decision to uphold the trial court's exclusion of this evidence was an unreasonable application of the following principles from *Washington v. Texas*, 388 U.S. 14 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id.* at 19. The State of Ohio does not dispute that a defendant may offer evidence to show that a third party committed the crime, but it contends that rules of procedure and evidence

points to the following factors: (1) he was the sole suspect in the investigation; (2) he was transported by car to the police station for questioning,[15] "precluding his ability to leave without the officers['] permission and willingness to drive him home"; (3) he was questioned at the police station and "interrogated for four hours (in an increasingly hostile setting)"; (4) he was "lied to by the officers regarding eyewitnesses['] placing Mason at the crime scene"; (5) he was "repeatedly told he was not under arrest even though his parole officer stood ready to immediately arrest him as soon as the interrogation ceased"; and (6) he was arrested for a parole violation after the February 12 interrogation. Petitioner's Br. at 95-96.

However, we agree with the State of Ohio that these circumstances do not demonstrate the functional equivalent of an arrest. Mason's first argument is unavailing. *See Stansbury*, 511 U.S. at 319 ("[A]n officer's subjective and undisclosed view concerning whether the person being interrogated is a suspect is irrelevant to the assessment whether the person is in custody."). We deem the mode in which Mason was transported for questioning to be irrelevant, because Mason himself admits that he "voluntarily came to the police station twice." Petitioner's Br. at 113. The fact that Mason was questioned in a "coercive environment" such as a police station does not necessarily constitute custodial interrogation. *Mathiason*, 429 U.S. at 495; *United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied*, 523 U.S. 1122 (1998). *Miranda* requires a significant deprivation of freedom. The possibility that Mason may not have been aware of the consequences of his participation in the interviews does not mean that he was in custody. *See Beheler*, 463 U.S. at 1125 n.3. Mason was repeatedly told that he was free to leave when he wished. The state courts concluded that Mason was not in custody at the time of questioning because he was not under arrest and he

---

[15] Mason notes that Potts drove him from his home to the Sheriff's Office in an unmarked police car with doors that could not be unlocked by passengers.

the petitioner's "personal loyalty to his siblings, girlfriend, and children, and an exceedingly violent environment throughout his upbringing." *Id.* Instead of pressing those points, defense counsel chose a strategy of residual doubt and only presented the petitioner's unsworn statement. *Id.*

We recognize the factual similarities between *Scott* and this case. However, after the Supreme Court decided *Williams*, we questioned whether the holding in *Scott* should be limited "to the narrow facts of a federal court contemplating a *habeas* petition after a state court has conducted an evidentiary hearing and made a finding of fact that had mitigating evidence been introduced, the defendant's recent criminal history would have been presented to the jury in rebuttal." *Carter*, 218 F.3d at 600 n.2. As we have noted above, no state or federal court has held an evidentiary hearing on Mason's ineffective assistance claim. We therefore believe that *Scott* is less relevant than it might otherwise be.

Based on the record before us, we agree with the Ohio Supreme Court that defense counsel exercised reasonable professional judgment in deciding not to present mitigating evidence about Mason's "good character and rehabilitation potential," *Mason*, 694 N.E.2d at 956, but we reiterate that counsel may have rendered ineffective assistance in failing to investigate (and thus being unable to present) potential mitigating evidence about Mason's background. We begin by noting that we have previously deemed the failure to present mitigating evidence when it was available to be "an abdication of advocacy" rather than a strategic decision. *Austin*, 126 F.3d at 849. This holding, however, necessarily requires an inquiry into the mitigating evidence that was available at the time of sentencing.

As discussed above, trial counsel's preparation for sentencing appears to have been limited to reviewing the documents that the prosecution disclosed to them and deposing Dr. Spare, who tried "to determine mitigation" and "to attempt to determine the likelihood of [Mason] being a repeat violent offender and/or his potential for rehabilitation."

Smalldon Aff. at ¶¶ 10-11. Dr. Spare concluded his report to defense counsel by predicting Mason's future behavior: "Based on the available evidence, Mr. Mason is not likely to be a repeat violent offender under ordinary circumstances. . . . [His] pattern is that of avoidance and running away as opposed to aggressive violence." Smalldon Aff. at ¶ 17. Therefore, the mitigating evidence available to defense counsel at sentencing concerned Mason's interactions with the state and Dr. Spare's assessment of Mason's character.

In dismissing Mason's petition for post-conviction relief, the trial court referred to the twelve mitigation exhibits in finding that "[t]he evidence regarding [Mason's] background which he now contends should have been introduced, was considered by Defense Counsel." *Mason*, No. 93-CR-0153, slip op. at 5. The trial court then listed the following evidence that the prosecution could have introduced in rebuttal:

A.  That [Mason] had multiple juvenile offenses and was committed to the Ohio Youth Commission as a juvenile (Mitigation Exhibits 2, 4, 11);
B.  That as an adult he had been in and out of prison and that while on parole, he committed multiple parole violations (Mitigation Exhibits 6, 7, 11, 12);
C.  That [Mason] had been a drug user since age 14 and was also a drug dealer (Mitigation Exhibit 10);
D.  [That Mason] engaged in other violent conduct, including threatening his ex-girlfriend with a gun (Mitigation Exhibits 11, 12, Deposition of Dr. Spare;);
E.  That help was offered to [Mason] at an early age, including counseling, in which he refused to participate (Mitigation Exhibit 3);
F.  That he raped Danielle Miller on October 7, 1992 (Dr. Spare deposition);
G.  That during the ten years prior to raping and murdering Robin Dennis, [Mason] had spent all but 19 months in prison, which included his parole being violated on four separate occasions (deposition of Dr. Spare).

the police suspect." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Mathiason*, 429 U.S. at 495). "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

In this case, Potts questioned Mason twice about Robin's disappearance. The first interrogation, which took place in the early afternoon of February 10, 1993, at the Sheriff's Office, was recorded on audiotape and lasted eighteen minutes. At the hearing on Mason's motion to suppress the statements made at this interrogation and the interrogation that followed, Potts described Mason as "real cooperative" and testified that Mason told him "to come back by" if he needed anything else. J.A. at 430, 460. Mason agreed that he made a "voluntary choice" to answer Potts's questions about Robin. J.A. at 506.

The second interrogation took place on February 12, 1993, in an interrogation room located in the basement of City Hall. This interview was also recorded, but it lasted for almost four hours. Mason was not formally arrested or told that he could not leave. He asked whether he was under arrest sometime after 4:03 p.m. and was told that he was not. Mason later testified that his mobility was hampered by being questioned in the basement. He also testified that he asked the police to take him back home and to terminate the interview.[14] However, he acknowledged on cross-examination that he could have gotten out of the interrogation room. After this interview, Mason's parole officer took Mason into custody for violating the conditions of his parole. Potts then gave Mason his *Miranda* warnings. The interview ended when Mason refused to waive his *Miranda* rights and requested a lawyer.

Mason argues that he was in custody during the interviews of February 10 and 12 and that his statements to the police should consequently not have been admitted at trial. Mason

------

[14]Mason also indicated that he had to leave in order to pay a utility bill.

## D. *Miranda* Violation

Since *Miranda v. Arizona*, 384 U.S. 436 (1966), courts have protected a defendant's privilege against self-incrimination by suppressing any statement "stemming from custodial interrogation of the defendant" if the police failed to comply with certain procedural safeguards. *Id.* at 444. At trial, the prosecution introduced statements that Mason had made to the police during interviews on February 10 and 12, 1993. Mason contends that the trial court should have suppressed these statements because they were made while he was in custody and before he received any *Miranda* warnings. The Ohio Supreme Court disagreed, concluding from the circumstances of the February interviews that Mason was not in custody during his interrogation and that he had made the statements voluntarily. *Mason*, 694 N.E.2d at 946. Because the state court correctly invoked *Miranda* in this case, we review its decision under the "unreasonable application" prong of § 2254(d)(1), specifically whether its application of the legal principles was "objectively unreasonable." *Williams*, 529 U.S. at 409. We must presume that the state court's factual findings are correct unless Mason offers clear and convincing evidence to rebut this presumption. 28 U.S.C. § 2254(e)(1).

The *Miranda* Court defined custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. A suspect is "in custody" for purposes of receiving *Miranda* protection if there has been a "formal arrest or restraint on freedom of movement." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). "[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam). *Miranda* warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom

*Id.* at 5-6. The Ohio Supreme Court determined that defense counsel reasonably chose not to present mitigating evidence about Mason's "good character and rehabilitation potential" because they did not want to run the risk of this negative rebuttal evidence. *Mason*, 694 N.E.2d at 956. The state supreme court did not explicitly base its conclusion about defense counsel's strategic motivations on whether state law would have allowed the prosecutor to use all of the negative evidence listed above. *Cf., e.g.*, *State v. Henness*, 679 N.E.2d 686, 698 (Ohio 1997) (limiting a prosecutor's right to "rebut false or incomplete statements regarding the defendant's criminal record . . . to those instances where the defense offers a specific assertion, by a mitigation witness or by defendant, that misrepresents the defendant's prior criminal history"). Because state law governs the scope of rebuttal evidence, we as a federal habeas court will accept the Ohio Supreme Court's interpretation of state law. *See Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001), *cert. denied*, — U.S. —, 122 S. Ct. 1323 (Mar. 18, 2002). However, we observe once again that this reasoning does not apply to mitigating evidence about Mason's background and life history, which trial counsel did not investigate and thus had no opportunity to present at sentencing. Testimony that simply put Mason's childhood into context without misrepresenting it would not have been subject to the prosecutor's rebuttal evidence, which mostly concerned Mason's character.

### c. Inadequate Psychiatric Assistance

Mason argues that he received ineffective assistance of counsel at sentencing because his attorneys acceded to inadequate psychiatric assistance. Specifically, he argues that Dr. Spare, the psychiatrist who examined him for the sentencing phase, failed to develop mitigating evidence and should have been disqualified due to a conflict of interest that stemmed from his treatment of Mason's wife. Petitioner's Br. at 33-34 n.8. In *Skaggs*, we held that counsel's use of an incompetent psychiatric expert at sentencing constituted ineffective assistance of counsel. *Skaggs*, 235 F.3d at 273-74. However, the defendant in *Skaggs* was protected by *Ake*

because he had claimed insanity as a defense at trial. *Id.* at 264. Mason's defense rested on residual doubt and the argument that Chris had murdered Robin; therefore, Mason was not entitled to psychiatric assistance during the sentencing phase under *Ake*. Moreover, the two cases can be distinguished because defense counsel did not present any expert psychiatric evidence in this case. *Cf. id.* at 267 (holding that defense counsel rendered constitutionally ineffective assistance by "fail[ing] to investigate and present meaningful mitigating evidence" and "us[ing] an incompetent and fraudulent 'psychologist' as the central mitigation witness").

However, according to the record before us, a competent psychiatric expert would have "conduct[ed] a wide-ranging, very thorough inquiry into Mr. Mason's psychosocial background." Smalldon Aff. at ¶ 12. Such an inquiry would no doubt have ameliorated the prejudicial effects of defense counsel's alleged failure to investigate Mason's life history. Therefore, although Mason was not entitled to psychiatric assistance under *Ake*, he may still have an ineffective assistance claim for the deficient performance of defense counsel in apparently relying on Dr. Spare for an independent investigation into mitigating evidence.

Mason pursued his ineffective assistance of counsel claim with diligence, raising it in all of his pleadings. He has yet to receive his request for an evidentiary hearing. We therefore remand this case to the district court with instructions to hold an evidentiary hearing and to determine, in light of the factors that we have discussed, whether defense counsel rendered constitutionally ineffective assistance with respect to the sentencing phase of Mason's trial.

## C. *Brady* Violation

After *Brady v. Maryland*, 373 U.S. 83 (1963), a prosecutor who suppresses evidence that is both favorable to a defendant and "material either to guilt or to punishment" violates due process, "irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The *Brady* rule encompasses both

We agree with the district court that Mason was not prejudiced by the nondisclosure of Hayden's notes. Both the Youngs testified at Mason's trial that, on the night of Robin's disappearance, Chris had stated his intention to kill her if he found her. Moreover, defense counsel cross-examined Michael Young about Chris's threats. Carolyn Young also testified on direct and cross-examination about Robin's Harley-Davidson shirts. As for the sighting of Robin on the night of her disappearance, Carolyn Young testified that she believed that she had seen Robin between 9:30 and 10 p.m., but stated that she had not worn her glasses and could not be certain about whether she had actually seen Robin in the car. Chris himself testified on both direct and cross-examination about being the beneficiary of Robin's life insurance policy. In light of the direct and cross-examination of the Youngs, we agree with the district court's conclusion that Hayden's notes do not present a reasonable probability of a different result at trial.

Finally, Mason claims that he suffered prejudice as a result of the prosecution's failure to disclose pretrial statements of seven witnesses, including the Youngs and Chris. According to Mason, all of these witnesses had seen Robin on the day of her disappearance and all "had given different versions of the facts surrounding the death of Robin Dennis [that] were impeaching as well as exculpatory and were required to be disclosed by the state." Petitioner's Br. at 85. We are unable to find the existence of any such documents in the record. We also agree with the district court's observation that defense counsel "cross-examined each of the listed witnesses in detail, and frequently used pretrial statements from those witnesses for impeachment purposes." *Mason*, 95 F. Supp. 2d at 760. Because Mason failed to indicate the existence or location of these statements, we conclude that he has been unable to show prejudice from their nondisclosure and that he has failed to overcome his procedural default, precluding him from asserting a *Brady* violation before us.

Mason also asserts that he suffered prejudice due to the nondisclosure of notes that Hayden took while conducting telephone interviews of the Youngs shortly before Mason's trial began. The district court summarized these notes as follows:

> During Hayden's conversations with the Youngs, both Michael and Carolyn Young indicated that they had moved from Ohio to South Carolina because they were receiving threatening letters and telephone calls from unknown people in connection with the trial. Michael Young told Captain Hayden that when Chris Dennis woke up late in the evening on February 8, 1993, he was angry that Robin Dennis was not there, and said he would kill her when he found her. Carolyn Young said she thought she had seen, several hours after Dennis was last seen alive, the Harley-Davidson T-shirt Dennis was wearing at the time of the murder. Carolyn Young said she thought she had seen Robin Dennis riding in a car on the evening of February 8, 1993, several hours after the prosecution argued that [Mason] killed Dennis. Both Youngs expressed concerns that Chris Dennis might have killed his wife in order to gain the proceeds of her life insurance.

*Mason*, 95 F. Supp. 2d at 759. Mason contends that these statements were necessary to his defense theory that Chris murdered his wife. The district court's review of the trial transcript, however, resulted in a finding that "the record demonstrates conclusively that [Mason] not only had access to, but actually attempted to proffer at trial, every piece of exculpatory evidence he now alleges he was unfairly deprived of by the state's failure to disclose Captain Hayden's telephone conversations with Michael and Carolyn Young." *Id.* at 760. Because the direct and cross-examination of witnesses imparted the substance of these conversations, the district court concluded that the disclosure of the notes themselves would not have created a reasonable probability of a different verdict. *Id.*

exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). Favorable evidence is material under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682. A reasonable probability is one that is "sufficient to undermine confidence in the outcome" of the trial. *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Mason did not raise a *Brady* claim on direct appeal, but he did raise one as his third ground for relief in his state post-conviction petition. The state trial court found that the *Brady* claim was barred by res judicata. The Ohio Court of Appeals held that "nearly all of the [*Brady*] claims set forth in [Mason's] petition were, or should have been[,] raised on direct appeal from his conviction," and then ruled against Mason on the merits. *Mason*, 1997 WL 317431, at *6. The district court found that Mason was in procedural default on the *Brady* claims, had not shown cause or prejudice, and could not make out a true *Brady* violation. *Mason*, 95 F. Supp. 2d at 758.

In *Coleman v. Mitchell*, 268 F.3d 417 (6th Cir. 2001), we reiterated that the application of res judicata under Ohio law "is an adequate and independent state ground justifying foreclosure of constitutional claims in habeas." *Id.* at 427 (citing *Rust v. Zent*, 17 F.3d 155 (6th Cir. 1994) and *Riggins v. McMackin*, 935 F.2d 790 (6th Cir. 1991)). However, federal habeas relief is available for constitutional claims defaulted in state court if a petitioner demonstrates cause and prejudice. *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

Mason attempts to dispute the district court's finding that the *Brady* claims were procedurally defaulted, but his arguments essentially point to cause. First, citing *Amadeo v. Zant*, 486 U.S. 214 (1988), Mason suggests that "the [state's]

very act of withholding the evidence in the first place establishes 'cause' for any alleged procedural default." Petitioner's Br. at 88. Second, he argues that "the fact that the documents were not available until state post-conviction again establishes adequate 'cause' for any alleged default. A petitioner is not required to raise on direct appeal claims for which he lacks a basis in fact, especially where the state has actually concealed the facts." Petitioner's Br. at 88 (internal citation omitted). However, as the district court noted, Mason has not shown why the basis for a *Brady* claim was not available on direct appeal. Conclusory statements about state concealment will not support a finding of cause. *Amadeo*, 486 U.S. at 222 ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.") (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).

Even assuming that Mason did have cause for failing to raise his *Brady* arguments on direct appeal, we are not persuaded that he can show prejudice. To obtain relief, Mason "must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Strickler v. Greene*, 527 U.S. 263, 289 (1999). In examining the suppressed evidence, we must ask "whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 290 (quotation omitted). We conclude that we cannot answer this question in the affirmative.

Mason describes three general categories of evidence that was allegedly withheld from his defense: (1) statements made by Robert Rodeffer ("Rodeffer") to police and medical personnel that he had been present at Robin's murder; (2) exculpatory statements made by Michael and Carolyn Young, friends of the Dennises, to Captain Al Hayden ("Hayden"), who interviewed them three days before the jury was impaneled; and (3) pretrial statements of various

witnesses that were allegedly inconsistent with their testimony at trial. The district court reviewed the record and determined that there was no reasonable probability that the disclosure of these statements would have produced a different result at trial. *Mason*, 95 F. Supp. 2d at 758-60. We agree.

Rodeffer was arrested on February 19, 1993, four days after the discovery of Robin's body, for stealing whiskey from a convenience store. At the time of his arrest, Rodeffer was both intoxicated and suicidal; he had apparently consumed three-quarters of a fifth of whiskey and seven sleeping pills. Soon after making the arrest, the police transported Rodeffer to Marion General Hospital for a medical evaluation. While being examined, Rodeffer indicated to the arresting officer that he had information about Robin's death, which he intimated was "satanic related." J.A. at 1915. Rodeffer stated that Robin had been ordered to get out of her car, hit in the back of the head, and then "hung by her neck with a large log chain." J.A. at 1923. As the district court noted, this description of Robin's injuries was inconsistent with her actual injuries. *Mason*, 95 F. Supp. 2d at 758.

After reviewing Rodeffer's statements and the surrounding circumstances, the district court concluded that "it strains credibility past the breaking point to suggest that there is a reasonable probability Rodeffer's evidence would have produced a different verdict." *Mason*, 95 F. Supp. 2d at 758. Mason contends that the district court's dismissal of Rodeffer's statements amounted to "an impermissible credibility determination that is not supported by the evidence and[,] more importantly, is not a factor properly considered in analyzing a *Brady* violation." Petitioner's Br. at 89. We disagree. *Bagley* instructs courts to remedy a *Brady* violation only if the undisclosed evidence presents a reasonable probability of a different result at trial. *Bagley*, 473 U.S. at 682. It was thus proper for the district court to consider the circumstances of Rodeffer's statements.