NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0121n.06

No. 20-3646

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Mar 17, 2022
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JERMAINE LATIFF ADAMS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE NORTHERN |
| | ) | DISTRICT OF OHIO |
| LYNEAL WAINWRIGHT, | ) | |
| | ) | |
| Respondent-Appellee. | ) | **OPINION** |
| | ) | |
| | ) | |

Before: COLE, CLAY, and THAPAR, Circuit Judges.

**CLAY, Circuit Judge.** Jermaine Latiff Adams ("Adams" or "Petitioner"), an Ohio

prisoner, appeals the district court's order dismissing his petition for a writ of habeas corpus under

28 U.S.C. § 2254. Petitioner made four claims related to his 2016 murder conviction before the

district court; however, he only appeals the district court's order as to his claim that the state trial

court provided erroneous jury instructions on self-defense. We **AFFIRM** for the reasons set forth

below.

## BACKGROUND

### A. Factual Background

On August 16, 2015, Adams shot victim Alondo Perry four times. Perry died as a result

of his injuries. Adams and Perry were roommates. They shared a house in Canton, Ohio, with

Petitioner's girlfriend, Beth Hartsel, and two other adults, Jessica Smith and Carlton Trammel.

Smith's two young children spent time in the house as well. On the day of the shooting, Adams

and Perry arrived at the house and knocked on the front door.  Trammel let them in.  According to Trammel, Adams and Perry were not fighting when they arrived at the house, and there was no indication that there were any problems between them.  Adams, Perry, and Trammel went to Adams' bedroom to watch television ("TV"), and Perry briefly stepped out of the room to take a call.  When Perry returned, Adams asked Trammel to leave the room so that Adams could speak with Perry in private.

Trammel left the room and exited the house through a back door.  Once outside, he walked across the yard toward a friend's house.  Trammel testified that about forty-five seconds later, as he reached the other side of the yard, he "heard a muffled sound like 'ch-ch-ch'" and a person's scream, but he did not return to the house.  (State Ct. Op., R. 6-1, Page ID # 135; Tr. Day 1, R. 6-1, Page ID # 523–24.)  Trammel stated that he learned about the shooting the following day, on August 17, 2015.

Jessica Smith, one of Adams' other roommates, confirmed much of Trammel's testimony when she testified at Petitioner's trial.  She stated that she heard Adams and Perry arrive at the house and go into Adams' bedroom.  Smith said that she was in a bathroom at the back of the house when Hartsel, Adams' girlfriend, came in and locked the bathroom door.  Shortly thereafter, Smith and Hartsel gathered the children and left the house.  On their way out, Smith saw Perry's body on the floor.  Outside the house, Smith saw Adams sitting on the steps with a gun in his hand.  Smith allegedly asked Adams what had happened.  Adams told Smith that someone tried to rob Perry, and he asked Smith to call 911.  Smith called 911, said an ambulance was needed, and left the scene with Hartsel and the children.

Following Smith's 911 call, E.M.T.s arrived at the house. They found Adams on the porch and asked him what happened. Adams said that he shot Perry because Perry had broken into the house and the two of them (Adams and Perry) had struggled over a gun. Adams then moved inside. When the police arrived, Adams was sitting in the living room. According to the police, he was "sweating profusely and breathing heavily." (State Ct. Op., R. 6-1, Page ID # Page ID # 137.) Adams then provided the police with an altered account of what had happened. He told officers that he and Perry had been in an argument before they arrived at the house, that the argument resulted in Perry demanding money from Adams, and that it turned physical when Adams and Perry reached Adams' bedroom. Adams said that Perry jumped on Adams' back and tried to reach for cash in his pocket, causing Adams to fall onto the bed. Adams alleged that he shot Perry because Perry threatened to stab him with scissors.

The police officers searched Adams' bedroom. One of them testified that he found Perry's body on the floor near the door of the bedroom. The police noted that there were items scattered throughout the bedroom, and that the arm of a pair of glasses found in the room was bent. The police also found two pairs of scissors, one on top of a dresser under some books, and a second pair under an article of clothing on the floor. The scissors found on the floor were silver with gold handles. The police also collected a .40 caliber semiautomatic firearm with one round in the chamber, a magazine containing seven rounds of ammunition, and four spent shell casings.

Later, at the police station, Adams provided a videotaped statement to the officers. Adams told the police that he and Perry were related and had known each other for a long time. He added that Perry often stayed with Adams at Adams' house. Adams said that Perry sold marijuana for a living and that Adams "tried to 'help him out,' but Perry 'acted like [Adams] owed him

3

something.'" (State Ct. Op., R. 6-1, Page ID # 137.) He further stated that on the day of the shooting, Perry became angry because his "connection," Bridgitte Hall, was running late. Eventually, Adams, Perry, and Hall left the house; however, Hall left the two men when Perry allegedly got agitated and "talk[ed] crazy" to her." (*Id.*) Adams said that after Hall departed, Adams tried to help Perry calm down on the way back to the house. Once they returned to the house, Adams, Perry, and Trammel allegedly made their way to Adams' bedroom. Adams claimed that Perry knew that Adams had $2,700 with him, and Perry allegedly demanded that Adams give him the money. When Adams refused to give Perry the money, Perry purportedly "'rushed' him and the two 'tussled' back and forth, with Perry attempting to reach into [Adams'] back pants and pocket to grab the money." (*Id.*) According to Adams, Perry got on top of him on the bed, at which point Adams reached for his handgun. Adams claimed that once he "got his bearings," Adams and Perry were on opposite sides of the bed and Adams realized that Perry had scissors in his hand. (State's Appellate Br., R. 6-1, Page ID # 127 (citing State's Exhibit 23B); State Ct. Op., R. 6-1, Page ID # 137.) Adams said that Perry threatened to stab Adams with the scissors and stood in front of the doorway with the scissors in his hand. Adams told officers that he shot Perry in response to Perry's threat, "but aimed low because he only wanted to get Perry away from him and did not want to kill him." (State Ct. Op., R. 6-1, Page ID # 138.)

In addition to providing a videotaped statement to the police, Adams submitted to a physical exam, gunshot residue test, and a DNA swab. The police found $2,630.75 in Adams' back pocket, a superficial cut on his left hand, and scrapes on his legs, which Adams attributed to mosquito bites. Additionally, the results from the gunshot residue test indicated that he had recently fired a gun.

4

The police also submitted the physical evidence from the scene for further analysis. The autopsy report confirmed that Adams shot Perry four times. It concluded that two of the four shots, one of which entered Perry's torso, were fatal. Additionally, a DNA analysis conducted on the two pairs of scissors revealed that the scissors found on the dresser "yielded a mixture of D.N.A. from more than one person," but the criminologist was unable to confirm whether the mixture included Perry's D.N.A. (State's Appellate Br., R. 6-1, Page ID # 114; *see also* State Ct. Op., R. 6-1, Page ID # 140.) The gold-handled scissors found on the ground contained traces of Adams,' but not Perry's, D.N.A. Finally, a firearm, gunshot residue, and fingerprint expert testified that the gun was discharged from within four feet of Perry.

## B. Procedural History

The government charged Adams with one count of murder and one count of having weapons while under disability. *See* Ohio Rev. Code §§ 2903.02(B), 2923.13(A)(3). A jury found Adams guilty of both counts, and the state court sentenced Adams to an aggregate prison term of twenty years to life in prison.

Adams appealed his conviction to the Ohio Court of Appeals. He argued six assignments of error, including: 1) the jury's convictions were against the manifest weight and sufficiency of the evidence; 2) the trial court abused its discretion in admitting gruesome and inflammatory evidence; 3) the trial was unfair as a result of prosecutorial misconduct; 4) the trial court erred in instructing the jury that Adams had a duty to retreat; 5) his trial counsel was constitutionally ineffective; and 6) the trial court abused its discretion when it did not allow testimony to be presented concerning the victim's criminal record.

5

The Ohio Court of Appeals affirmed Adams' convictions in March 2017. The court reviewed Adams' jury instructions claim for plain error. It found that although the jury had been improperly instructed on self-defense because the trial court erroneously stated that Adams had a duty to retreat, the error was harmless because the outcome of the trial would not have clearly been different without the instruction. (*Id.* at Page ID # 148–49 (citing *State v. Cooperrider*, 448 N.E.2d 452 (1983) ("[A]n erroneous jury instruction 'does not constitute a plain error or defect under Crim. R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise.'") (quoting *State v. Long*, 372 N.E.2d 804 (1978)).) The court also determined that Adams' trial counsel was not constitutionally ineffective. The court applied the framework laid out by *Strickland v. Washington* and determined that Adams was not prejudiced by his trial counsel's deficiencies. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). In doing so, the court referenced its finding as to Adams' jury instructions claim and it stated as follows:

> We have already determined the outcome of appellant's trial would not have been clearly different if the trial court had not given the duty to retreat instruction, supra. We further find that Appellant has failed to establish the second prong of *Strickland* as well, i.e., that there is a reasonable probability that, but for counsel's failure to object to the instruction, the result of the proceeding would have been different.

(State Ct. Op., R. 6-1, Page ID # 151.) The Ohio Supreme Court denied leave to appeal. *State v. Adams*, 81 N.E.3d 1272 (Ohio 2017) (table).

Adams subsequently filed a pro se petition to vacate or set aside his conviction and sentence due to his trial counsel's alleged ineffective assistance.[1] The trial court denied the petition,

---

[1] In his opening brief, Adams states that "[t]he issues raised in that application are irrelevant here." (Appellant's Br. 16 n.3.) In fact, Adams' petition for postconviction relief in state court raised the claim of his trial counsel's alleged ineffective assistance, which is central to his argument for excusing the procedural default of his jury instructions claim. (Appellant's Br. 62 ("Adams can show the ineffective assistance required to overcome any procedural default."); Pet. to Vacate,

concluding that Adams' claims were barred by *res judicata*. Petitioner appealed; however, the Ohio Court of Appeals dismissed his case for failure to prosecute. The court denied Adams' subsequent motion for reconsideration. Adams did not appeal that decision to the Ohio Supreme Court.

In December 2017, Adams filed the habeas corpus petition now before the Court. He brought four claims, including: 1) the jury's convictions were against the manifest weight of the evidence; 2) the trial court provided erroneous jury instructions; 3) the prosecutor's misconduct interfered with his right to a fair trial; and 4) he was denied his right to effective assistance of appellate counsel. Subsequently, however, Adams conceded grounds one and four of his petition did not present issues cognizable on habeas review.

In a Report and Recommendation ("recommendation"), the magistrate judge recommended that the district court dismiss Adams' petition in its entirety. The recommendation concluded that "Grounds One through Four of Adams' petition lack merit; Ground One fails to present any issue cognizable on habeas review; and Ground Two is procedurally defaulted." (R. & R., R. 11, Page ID # 1075.) Adams only objected to the recommendation as to ground two.

Accordingly, the district court adopted the magistrate judge's recommendation as to all of Petitioner's claims except for ground two. Reviewing Adams' argument *de novo*, the district court concluded that his jury instructions argument was procedurally defaulted, and Adams failed to establish cause and prejudice to excuse the default. It also concluded that, pursuant to 28 U.S.C. § 1915(a)(3), there was no basis upon which to issue a certificate of appealability ("COA").

---

R. 6-1, Page ID # 195–98; *see also* Resp. to Pet., R. 6-1, Page ID # 200–05.) While the Court need not defer to that adjudication under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), *see infra* note 2, the issues raised in that application are nevertheless relevant here.

7

Adams appealed the district court's judgment and moved the Court for a COA, to proceed in forma pauperis, and for the appointment of counsel. The Court granted Adams' motions in March 2021.

## II. DISCUSSION

### A. Standard of Review

The Court reviews *de novo* a district court's decision denying a habeas petition, *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009), "particularly the determinations involving matters of law or mixed questions of law and fact," *Gumm v. Mitchell*, 775 F.3d 345, 359–60 (6th Cir. 2014). "A district court's finding that a petitioner has procedurally defaulted on a claim is also reviewed *de novo*." *McKinney v. Horton*, 826 F. App'x 468, 471 (6th Cir. 2020) (citing *Goldberg v. Maloney*, 692 F.3d 534, 537 (6th Cir. 2012). Additionally, under AEDPA, the Court may "may not grant a habeas petition with respect to any claim that was adjudicated on the merits in a state court unless the adjudication resulted in a decision that: (1) was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court' or (2) was based upon an 'unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *McKinney*, 826 F.3d at 471 (quoting 28 U.S.C. § 2254(d)).

### B. Analysis

Adams argues that his jury instructions claim "overcome[s] any procedural default resulting from trial counsel's failure to object to the erroneous instruction that Adams had a duty to retreat before defending himself in his home." (Appellant's Br. 22.) For the reasons set forth below, we conclude that the district court did not err when it determined that 1) Petitioner's jury

instructions claim was indeed procedurally defaulted and 2) Petitioner failed to demonstrate the prejudice necessary to excuse the default.

### i.     Procedural Default

Petitioner's jury instructions claim was procedurally defaulted. *See also Osborne v. Ohio*, 495 U.S. 103, 124 (1990); Ohio Rev. Code Ann. § 2901.09 (West). Indeed, when the Ohio trial court erroneously instructed the jury that Adams had a duty to retreat despite the fact that the incident took place in his home, Adams' trial counsel did not object. Accordingly, the Ohio Court of Appeals reviewed the claim for plain error under Ohio's contemporaneous objection rule, and it found that Adams' claim did not meet that standard. *See State v. Long*, 372 N.E.2d 804, 808 (Ohio 1978) (concluding that a defendant's failure to object to a jury instruction at trial forecloses appellate review of the instruction absent plain error given Ohio's contemporaneous objection rule); *see also Awkal v. Mitchell*, 613 F.3d 629, 649 (6th Cir. 2010) ("Federal habeas review is generally precluded where a state court decides not to address a petitioner's federal claims because he has failed to meet a state procedural requirement 'that is independent of the federal question and adequate to support the judgment.'") (citing *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).

The district court thus concluded that Petitioner's jury instructions claim was procedurally defaulted and properly proceeded to consider whether Adams demonstrated the requisite "cause and prejudice" to excuse the default. (Mem. Op. & Order, R. 14, Page ID # 1101–02 (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).)

### ii.    Cause and Prejudice

As a preliminary matter, the resolution of Adams' jury instructions claim is not subject to heightened deference to the state court's *Strickland* adjudication pursuant to AEDPA.[2] *McKinney*, 826 F.3d at 471; 28 U.S.C. § 2254(d); (State Ct. Op., R. 6-1, Page ID # 151 (concluding that Petitioner failed to establish the second prong of *Strickland*).  Indeed, although Petitioner brings the ineffective assistance argument as the basis for cause and prejudice for his procedural default, the state court's decision regarding Adams' *jury instructions claim* was not adjudicated on the merits.  *See Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003) (concluding that plain error review under Ohio's contemporaneous objection rule is not a merits determination); (*see also* Appellant's Br. 21 (arguing that Adams' jury instructions claim was not adjudicated on the merits in state court); *accord* Appellee's Br. 17); *see also supra* note 2.

In regard to the applicable cause and prejudice standard for excusing Petitioner's default, the district court correctly concluded the following:

> In order to overcome the procedural default (for Petitioner's failure to object to the self-defense jury instruction at trial) Petitioner must demonstrate both "cause for the default" and "actual prejudice" from the alleged error of federal law.  *Coleman*

---

[2] Respondent claims that Adams' claim *is* subject to heightened deference under AEDPA because the state court adjudicated Adams' ineffective assistance argument, which serves as the cause and prejudice for the procedural default, on the merits.  However, there is a distinction between an ineffective assistance claim that is brought forth as the basis for an application for a writ of habeas corpus, and one that serves as the basis for establishing cause and prejudice to excuse a procedural default.  *Joseph v. Coyle*, 469 F.3d 441, 459 (6th Cir. 2006) ("Although [Petitioner] must satisfy the AEDPA standard with respect to his independent IAC claim, he need not do so to claim ineffective assistance for the purpose of establishing cause."); *Hall v. Vasbinder*, 563 F.3d 222, 236–37 (6th Cir. 2009) ("An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel.  The latter must meet the higher AEDPA standard of review, while the former need not.") (citing *Joseph*, 469 F.3d at 459); 28 U.S.C. § 2254(d).  Accordingly, Adams correctly notes that the Court need not defer to the state court's adjudication of Adams' ineffective assistance claim under AEDPA.  (Reply Br. 23–26.)

> *v. Thompson*, 501 U.S. 722, 750 (1991). To establish cause, Petitioner must demonstrate that an objective factor "external to the defense" impeded his efforts to comply with the state procedural rule . . . . To establish actual prejudice, a habeas petitioner must show that the trial was "infected with constitutional error." *Wade v. Timmerman-Cooper*, 785 F.3d 1059, 1077 (6th Cir. 2015). An error in jury instructions alone is not a basis for habeas relief. *Scott v. Mitchell*, 209 F.3d 854, 875 (6th Cir. 2000). To warrant habeas relief, jury instructions must not only have been erroneous, "but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair." *Id.*at 882.

(Mem. Op. & Order, R. 14, Page ID # 1102–03.)

Petitioner argued that he met these requirements by showing that he received ineffective assistance of counsel. Accordingly, the district court embedded the *Strickland* ineffective assistance framework into its procedural default analysis. It found that Petitioner's trial counsel's deficiencies established adequate cause for the default.[3] This conclusion was proper considering that a "reasonably effective" attorney in Petitioner's trial counsel's shoes would have objected to a jury instruction that 1) went to Petitioner's only affirmative defense, and 2) violated Ohio's long-standing doctrine that there is no duty to retreat within the home. *See Strickland*, 466 U.S. at 694; Ohio Rev. Code Ann. § 2901.09 (West).

But the district court determined that Petitioner failed to establish actual prejudice for the default. The court noted that, "[i]n analyzing actual prejudice under an ineffective assistance of counsel claim, a petitioner must show that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[4] (Mem. Op. &

---

[3] This conclusion mirrored the judgment of the Ohio Court of Appeals, which decided the *Strickland* question on prejudice grounds.

[4] Adams argues that the district court and the Ohio Court of Appeals did not actually apply this test in assessing his *Strickland* claim; rather, he claims that they "conflated prejudice with sufficiency-of-the-evidence review, reasoning that Adams could not show prejudice because the jury *could have* rejected his self-defense argument even if properly instructed." (Appellant's Br.

Order, R. 14, Page ID #1103 (quoting *Mason*, 320 F.3d at 617).) Applying that standard, the district court determined that "[t]he record does not demonstrate that counsel's failure to object to the jury instructions resulted in actual prejudice to the Petitioner." (*Id.*) It concluded that "the improper jury instruction on self-defense did not 'so infect[] the entire trial that the resulting conviction violates due process." (*Id.* at 1104 (quoting *Estelle v. McGuire*, 502 U.S. 62, 72 (1991).

This conclusion was similarly proper. As the district court pointed out, "[t]o warrant habeas relief, jury instructions must not only have been erroneous, 'but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair." (*Id.* (quoting *Scott*, 209 F.3d at 875).) Looking at the record with fresh eyes, the evidence fails to show that "there is a *reasonable probability* that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added) (concluding that a "reasonable probability" is a "probability sufficient to undermine confidence in the outcome."). Indeed, a self-defense claim requires the following under Ohio law: 1) the shooter was "not at fault in creating the situation giving rise to the affray;" 2) the shooter "has a bona fide belief that he was in imminent

---

23 (emphasis in original).) He adds that, "[i]n short, the state and district courts asked only if it was possible that Adams could lose; they should have asked whether it was reasonably possible he could win." (*Id.* at 23–24.)

This reading mischaracterizes the lower courts' references to the state court's finding as to Ohio's contemporaneous objection rule. (*See* Mem. Op. & Order, R. 14, Page ID # 1103; *see also* State Ct. Opinion, R. 6-1, Page ID # 185–87 ("We have *already determined* the outcome of appellant's trial would not have been *clearly different if the trial court had not given the duty to retreat instruction, supra*. We *further find appellant has failed to establish the second prong of Strickland as well*, i.e., that there is a reasonable probability that, but for counsel's failure to object to the instruction, the result of the proceeding would have been different.") (emphasis added).) Indeed, the district court and the Ohio Court of Appeals both explicitly and properly recognized that there are different standards for reviewing prejudice to a defendant when considering a claim under Ohio's contemporaneous objection rule versus the framework laid out by *Strickland*.

danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force;" and 3) the shooter "must not have violated any duty to retreat or avoid the danger." *State v. Robbins*, 388 N.E.2d 755, 758 (1979). Additionally, "[i]f the force used is so greatly disproportionate . . . to show an unreasonable purpose to injure the victim, then the defense of self-defense is not available." *State v. Hunter*, Cuyahoga App. No. 86048, 2006-Ohio-20, ¶ 56 (citing *State v. Jackson*, 490 N.E.2d 893, 897 (Ohio 1986)).

Adams contends that he shot Perry four times with a handgun to repel the threat of a use of scissors. (Appellant's Br. 8–10, 50; *see also* Appellee's Br. 27 ("Finally, the force employed by Adams – four shots at close range – was far more than required to repel someone threatening him with scissors . . . ."); State Ct. Op., R. 6-1, Page ID # 137, 187.) And the evidence indicates that Adams retrieved his gun from between the mattress and the footboard of his bed *before* Perry allegedly threatened him with the scissors at doorway of the bedroom.

The record contains other evidence that reduces any "reasonable probability" that a properly-instructed jury would have acquitted Adams. First, the record fails to confirm Adams' claims about what happened on the day of the shooting.[5] Indeed, Trammel testified that he let both Adams and Perry into the house, that the group went upstairs to watch TV, and that Adams asked Trammel to leave the room so that Adams could talk to Perry in private. Trammel testified that there were no signs of Perry's alleged agitation when Adams and Perry arrived at the house. The

---

[5] The first time Adams was asked what happened, he allegedly said that someone tried to rob Perry. (State Ct. Opinion, R. 6-1, Page ID # 136.) The second time, Adams claimed that Perry had broken into the house and the two of them (Adams and Perry) struggled over a gun. (*Id.* at Page ID # 137–38). The third and fourth times, and in his arguments before the Court, Adams argued that Perry tried to steal his money after losing his temper and threatened him with a pair of scissors. (*See* State Ct. Opinion, R. 6-1, Page ID # 137; Appellant's Br. 5–11.)

13

nature of the physical evidence also limits the reasonable probability that the erroneous duty-to-retreat instruction affected the outcome of the trial. Critically, the scissors that Perry allegedly used to threaten Adams were found under an article of clothing on the floor, and the handles of those scissors contained Adams,' rather than Perry's, DNA. Additionally, contrary to Adams' contention that "he was trying to disable Perry rather than fatally wound him," (Appellant's Br. 50), the autopsy report revealed that one of the gunshots entered Perry's body through the left side of his torso, (State Ct. Op., R. 6-1, Page ID # 139; State's Appellate Br., R. 6-1, Page ID # 113–114).

Adams correctly notes that he need not "prove 'an insufficient basis to convict'" to successfully show the requisite "cause and prejudice" to excuse a procedural default. (Appellant's Br. 23 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434–35 (1995)).) But that is not the standard under which the district court reviewed Adams' jury instructions claim. Instead, it concluded that given the evidence before the jury, it was not *reasonably probable* that Adams would have been acquitted had the jury been aware that Adams did not have a duty to retreat within his home. *See also Strickland*, 466 U.S. at 694. Considering the record and Ohio's law on self-defense, this conclusion was not erroneous.

## CONCLUSION

For the reasons set forth above, the Court **AFFIRMS** the district court's order dismissing Adams' petition for a writ of habeas corpus.